# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 83
Roxanne Delgado, et al.,
     Appellants,
   v.
State of New York et al.,
     Respondents.

Cameron J. Macdonald, for appellants.
Victor Paladino, for respondents.
Carl E. Heastie, amicus curiae.

CANNATARO, Acting Chief Judge:

In this declaratory judgment action, plaintiffs challenge the constitutionality of part HHH of chapter 59 of the Laws of 2018 (the enabling act), in which the Legislature tasked the Committee on Legislative and Executive Compensation with determining, after

- 1 -

consideration of various factors, whether "the salary and allowances of the members of the [L]egislature" and certain other state officials "warrant an increase" (L 2018, ch 59, part HHH, § 2 [2]).  The enabling act further provided that the Committee's recommendation with respect to any salary changes would become effective unless modified or abrogated by statute.  Inasmuch as defendants have failed to overcome the presumption of constitutionality afforded to the enabling act as a duly enacted state statute (*see Matter of County of Chemung v Shah*, 28 NY3d 244, 262 [2016]), we affirm.

I.

The constitutionality of the enabling act cannot be assessed without an overview of the framework governing adjustments to the compensation of state officers.  Historically, legislative salaries were "fixed, primarily on a per diem basis, by the [New York] Constitution, and could be changed only by constitutional amendment" (*Dunlea v Anderson*, 66 NY2d 265, 268 [1985]).[1]  In 1948, however, the Legislature amended article III, section 6 to provide that legislators shall receive for "services a like annual salary, to be fixed by law," with the proviso that compensation could neither be increased nor diminished during, and with respect to, the term for which the legislator was elected.  Thereafter, the compensation for members of the Legislature and allowances for members serving as officers or in a special capacity were set forth in Legislative Law §§ 5 and 5-a.

---

[1] Legislative compensation was initially "to be ascertained by law," subject to a maximum of $3 per day (*see* 1821 NY Const, art I, § 9).  Beginning in 1846, compensation was fixed in the Constitution at "a sum not exceeding three dollars per day" and not to exceed an aggregate of $300 (1846 NY Const, art III, § 6; *see* 2 Charles Z. Lincoln, The Constitutional History of New York at 132-133 [1906]).

Similarly, the salaries of the Comptroller of the State of New York and Attorney General were set forth in Executive Law §§ 40 and 60, respectively. Salaries for certain other state officers in the executive branch, such as agency commissioners, were contained in Executive Law § 169. On their face, those statutes resemble Judiciary Law article 7-B (*see* Judiciary Law §§ 221—221-i), which implements the "Compensation Clause" for judges contained in article VI, § 25 (a) of the New York Constitution.

The Compensation Clause provides that the "compensation" of judges covered by article VI of the State Constitution "shall be *established by law* and shall not be diminished during the term of office for which" the judge was elected or appointed (NY Const, art VI, § 25 [a] [emphasis added]).[2] In accordance with this mandate, salary schedules were

---

[2] Unlike articles III, § 6 and XIII, § 7 of the New York Constitution, which provide that legislative compensation may not "be increased or diminished during, and with respect to, the term for which [the state officer] shall have been elected or appointed," article VI, § 25 (a) prohibits only diminishment, not increase, of judicial compensation. In addition, article III, § 6 and article XIII, § 7 of the Constitution require that the salaries of certain state officers be "fixed *by law*," while article VI, § 25 (a) requires that judicial salaries be "established *by law*" (emphasis added). We note that, with the exception of a brief period in the early 20th century, during which the Constitution included a salary schedule for members of the judiciary, the State Constitution has provided since 1846 that "compensation" of judges is to be "established by law" (1846 NY Const, art VI, § 7; *see Maron*, 14 NY3d at 251; *see also Gresser v O'Brien*, 146 Misc 909, 916-919 [Sup Ct, NY County 1933], *affd* 263 NY 622 [1934]). Although the dissenters rely on cases involving judicial salaries in part V of the dissent—which unconvincingly attempts to parse the meaning of the phrase "by law" in the state Constitution (dissenting op at 22-30)—the dissent self-contradictorily expresses confusion as to why we have chosen to look to cases involving judicial salaries, questioning whether "those other cases" are "close enough" (dissenting op at 2). The explanation for our reliance on this Court's precedent addressing judicial salaries is simple: Whatever the difference in meaning between "fixed" and "established," the critical phrase common to the relevant constitutional provisions for purposes of this appeal is "by law."

typically set forth in statutes enacted by the Legislature (*see* 4 Charles Z. Lincoln, The Constitutional History of New York at 590-591 [1906]).

The Legislature altered that practice in 2010 after this Court addressed the Compensation Clause and related separation of powers issues following "the failure of the Legislature and the Executive to come to an agreement on legislation effecting a [judicial] pay raise" from the levels set by the 1998 amendment of the Judiciary Law (*Maron*, 14 NY3d at 246). We explained that judicial salary increases had been proposed by Governors on several occasions between 2006 and 2009, but statutes reflecting those increases were not enacted because the relevant bills "did not [also] provide for an increase in legislative pay" or because the Legislature refused to also "enact[] campaign finance and ethics reform measures" demanded by the Governor (*id.* at 245). *Maron* reaffirmed that "although the diminution in value of judicial compensation by inflation was a concern, the drafters [of the Compensation Clause] decided that the best way to combat the effects of inflation was to count on the Legislature—the body directly accountable to the public—to assure the fair and appropriate compensation of the Judiciary" (*id.* at 254). Thus, we recognized that "whether judicial compensation should be adjusted, and by how much, is within the province of the Legislature" (*id.* at 263). Nevertheless, we concluded "that the State had unconstitutionally compromised the independence of the judiciary over the course of three years by linking any decision on whether to increase judges' salaries with other legislative initiatives such as the enactment of legislative pay increases and campaign finance reform" (*Larabee v Governor of the State of N.Y.*, 27 NY3d 469, 473 [2016], citing *Maron*, 14 NY3d at 245-246, 260-261).

Notably, in describing "the continuing inertia underlying [the judicial salary] dispute" (*id.* at 246), the *Maron* Court observed that the Senate passed bills in 2007 "calling for the creation of a commission to review future salary increases for both judges *and* legislators" and "a commission to examine future increases in judicial salaries taking into account the needs of the Judiciary and the State's ability to pay" (*id.* at 245; *see* 2007 NY Senate Bills S5313, S6550). Like the enabling act here, those bills directed the proposed commissions to make recommendations, based upon various non-exclusive factors set forth in the bills, in a report to the Governor, the Legislature and the Chief Judge by a certain date; those recommendations would "have the force of law" and "supersede inconsistent provisions of" the Judiciary Law, Executive Law and Legislative Law unless "modified or abrogated by statute" (2007 NY Senate Bill S5313, §§ 3 [i], 4 [h]; 2007 NY Senate Bill 6550, § 3 [h]).

Shortly after our decision in *Maron*, the Legislature passed a law creating the Commission on Judicial Compensation (*see* L 2010, ch 567). The 2010 statute, intended to comply with *Maron* (*see* Senate Introducer's Mem in Support, Bill Jacket, L 2010, ch 567, at 8) and enacted with the support of the Office of Court Administration (*see* Letter from Off of Ct Admin, Dec 23, 2010, Bill Jacket, L 2010, ch 567, at 9), closely resembles the enabling act at issue here. The 2010 statute required the Commission to "make recommendations with respect to adequate levels of compensation and non-salary benefits for judges" after assessing a list of non-exclusive factors (L 2010, ch 567, § 1 [a]); following the Commission's submission of those recommendations to the Governor, Legislature and Chief Judge, the recommendations would "have the force of law, and . . .

supersede inconsistent provisions of article 7-B of the judiciary law, unless modified or

abrogated by statute prior to April first of the year as to which such determination applies"

(*id.* § 1 [h]).

In *Larabee*, we explained the effect of the supersession clause contained in the 2010

statute: "Under th[e] new law, when the Commission recommends an increase in judicial

salaries, the increase goes into effect by operation of law on April 1 of the year for which

it is recommended, unless the Legislature passes a statute rejecting the recommended pay

raise" (*Larabee*, 27 NY3d at 472).[3]  The Court opined that the enactment of the 2010 statute

remedied "the constitutional violation that led to our decision in *Matter of Maron*," and

---

[3] The dissent takes issue with our citation to the facts in *Larabee* (dissenting op at 13-14).
We look to *Larabee* in describing the historical background leading to the dispute at issue
in this case.  Specifically, in *Larabee*, we acknowledged that it was "[i]n response to our
decision in *Matter of Maron*, [that] the [L]egislature passed, and the Governor signed,
legislation establishing an independent Commission on Judicial Compensation, which was
empowered to recommend prospective judicial compensation increases at four-year
intervals after the effective date of the legislation" (*Larabee*, 27 NY3d 472).  The dissenters
are correct that the parties in the recent judicial pay cases did not meaningfully address the
existence of the supersession clause that we explicitly highlighted in explaining that the
2010 legislation created a "process" through which "the issue of judicial compensation
now receives consideration independent of other political matters" (*Larabee*, 27 NY3d at
472).  Perhaps that is because, as plaintiffs have acknowledged since the outset of this
action, "the Legislature may delegate judicial compensation decisions."  In making that
concession before Supreme Court, plaintiffs cited this Court's decision in *Matter of
Benvenga v LaGuardia* (294 NY 526, 533 [1945]), and correctly acknowledged "that was
the understanding for almost [100] years" prior to the amendment of article III, section 6
to provide that legislative compensation shall "be fixed by law."  In any event, the facts of
*Larabee* and our statements therein, like those of the other judicial pay cases, have
relevance to the developments that have led to this case.

"through this legislatively-created process, the issue of judicial compensation now receives consideration independent of other political matters" (*id.*).[4]

II.

In 2015, as part of its annual budget bill, the Legislature created another similar commission—the Commission on Legislative, Judicial and Executive Compensation—which was charged with meeting quadrennially to make recommendations regarding adequate levels of compensation for members of the Legislature, judges, statewide elected officials and certain state officers (*see* L 2015, ch 60, Part E, § 2).  The 2015 statute was, once again, similar to the enabling act challenged in this action.  Under the terms of the 2015 legislation, the Commission was required to submit to the Legislature its recommendations by a specified date; the recommendations would "have the force of law, and . . . supersede, where appropriate, inconsistent provisions of article 7-B of the judiciary law, section 169 of the executive law, and sections 5 and 5-a of the legislative law, unless modified or abrogated by statute" by a date certain (L 2015, ch 60, § 1, Part E, § 3 [7]).  The Commission made recommendations only as to judicial salaries, which first took effect in April 2016.

A declaratory judgment action was commenced challenging the 2015 statute as an unconstitutional delegation of legislative authority without reasonable standards or safeguards.  Supreme Court granted the defendants' motion for summary judgment, and

---

[4] The Commission authorized by the 2010 statute recommended a 27% increase in judicial salaries that was phased in over the course of three years commencing in 2012 (*see Larabee*, 121 AD3d 162, 169 [1st Dept 2014] [Sweeny, J., concurring]).

the Appellate Division affirmed (*Center for Jud. Accountability, Inc. v Cuomo*, 167 AD3d 1406, 1411 [3d Dept 2018], *appeal dismissed* 33 NY3d 993 [2019], *reconsid denied* 34 NY3d 960 [2019]; *lv denied* 34 NY3d 961 [2019], *rearg denied* 34 NY3d 1147 [2019]). The Appellate Division reasoned that "[t]he factors established by the Legislature" in the 2015 statute "provide[d] adequate standards and guidance for the exercise of discretion by the Commission" and "the enabling statute contains the [additional] safeguard of requiring that the Commission report its recommendations directly to the Legislature so that it . . . [can] exercise its prerogative to reject any Commission recommendations before they become effective" (*id.*).  In 2019, we dismissed the appeal from the Appellate Division's order on the ground that no substantial constitutional question was directly involved (33 NY3d 993 [2019]), and thereafter denied leave to appeal (34 NY3d 961 [2019]).

The Legislature created a similar body as part of its 2018 budget bill—the Committee on Legislative and Executive Compensation at issue here—which was tasked with examining the "prevailing adequacy of pay levels" for members of the Legislature, statewide elected officials, and state officers whose salaries are set forth in Executive Law § 169, and determining whether their annual salaries "warrant an increase" (L 2018, ch 59, part HHH, § 2 [2]).  Like the prior statutes and proposed Senate bills, the enabling act set forth a similar non-exclusive list of factors for the Committee to consider in determining adequacy of salaries (*id.* § 2 [3]).  The Committee was required to report its findings, conclusions, determinations and recommendations to the Legislature and the Governor by December 10, 2018 (*id.* § 4 [1]).  Those recommendations would "have the force of law . . . unless modified or abrogated by statute" before January 1, 2019 (*id.* § 4 [2]).  The

recommendations, upon becoming effective, would "supersede, where appropriate, inconsistent provisions" of Executive Law § 169 and Legislative Law §§ 5 and 5-a (*id.*).

Following four public meetings, the Committee recommended increasing the base salaries of members of the Legislature from $79,500 to $110,000 on January 1, 2019, and that all stipends under Legislative Law § 5-a be set at zero except for the stipends of approximately a dozen legislators. Additionally, the Committee recommended increasing the salaries of the Attorney General, Comptroller and the officers listed in Executive Law § 169. The Legislature did not subsequently modify or abrogate any of the Committee's recommendations. Thus, in accordance with the act, the recommendations acquired "the force of law" (L 2018, ch 59, part HHH, §§ 1, 4 [2]).

Plaintiffs, three New York resident taxpayers and one member of the New York State Assembly, commenced this action for declaratory and injunctive relief against defendants, the State of New York and Thomas DiNapoli, in his official capacity as New York State Comptroller. Plaintiffs asserted that the enabling act unconstitutionally delegated legislative authority to the Committee. Supreme Court granted, as relevant here, defendants' motion to dismiss plaintiffs' claims regarding salary increases for statewide elected officials and commissioners, and the salary increase recommended for legislators beginning in 2019.[5] Upon plaintiffs' appeal, the Appellate Division unanimously modified

---

[5] With respect to legislative salary increases to become effective on January 1, 2020 and beyond, the Committee also recommended placing a 15% cap on outside earned income and prohibiting the receipt of income in certain professions where a fiduciary duty is owed. Supreme Court concluded that the Committee exceeded its authority by recommending these limitations and, because the legislative salary increases recommended for 2020 and 2021 were intertwined with those recommendations, the court declared those salary

the judgment to the extent of issuing a declaration that the enabling act had not been shown to be unconstitutional, and otherwise affirmed (194 AD3d 98 [3d Dept 2021]). The Court concluded that plaintiffs' argument was "foreclosed by [its] decision in *Center for Jud. Accountability Inc. v Cuomo* . . . , wherein [the Court] upheld a nearly identical delegation of authority regarding judicial compensation" (*id.* at 103 [internal citation omitted]). The Appellate Division also rejected plaintiffs' arguments that the enabling act was invalid because the Governor did not maintain veto power over the Committee's recommendations (*id.* at 104) and because the New York Constitution provides that legislative compensation is to be "fixed by law" (NY Const, art III, § 6), which plaintiffs construed as meaning "codified in a published statute passed by the Legislature itself" (194 AD3d at 105). Finally, the Court held that the Committee did not exceed the scope of its authority under the enabling act (*id.* at 107).

Plaintiffs now appeal as of right from the Appellate Division order.

III.

---

increases to be null and void. Inasmuch as defendants did not cross-appeal, any issues regarding the propriety of those recommended salary increases are not before us. Similarly, to the extent that the Committee may have recommended a slight decrease in the total salary and allowance for the senator holding the office of Vice President pro tempore—who, incidentally, was not reelected in 2018 and, therefore, experienced no salary decrease beginning in 2019 under the enabling act (*see* Vivian Wang, Democratic Insurgents Topple 6 New York Senate Incumbents, NY Times, Sept. 13, 2018; Jesse McKinley, No Lulus for You: Comptroller Threatens to Withhold Lawmakers' Payments, NY Times, March 16, 2018)—no party has challenged the Committee's actions on the ground that one legislator would have experienced a decrease in compensation. Thus, the dissent's reliance on that recommendation is misplaced (*see* dissenting op at 12-13).

The New York Constitution dictates that "[t]he legislative power of this State shall be vested in the Senate and the Assembly" (NY Const, art III, §1) and, therefore, "the Legislature cannot pass on its law-making functions to other bodies" (*Matter of Levine v Whalen*, 39 NY2d 510, 515 [1976]). "The Legislature may not," for example "grant the power to repeal general statutes" (*Matter of Benvenga v LaGuardia*, 294 NY 526, 533 [1945]). This Court has long recognized, however, that although the Legislature alone may exercise powers inherently and exclusively legislative, "there is a large field in which the [L]egislature . . . may certainly delegate to others powers which the [L]egislature may rightfully exercise itself" (*Matter of Trustees of Vil. of Saratoga Springs v Saratoga Gas, Elec. Light & Power Co.*, 191 NY 123, 138 [1908] [internal quotation marks omitted]). In that vein, while "[t]he delegation of power to make the law, which necessarily involves a discretion as to what it shall be, cannot be done, . . . [t]he Legislature may constitutionally confer discretion upon an administrative agency [or a commission] . . . if it limits the field in which that discretion is to operate and provides standards to govern its exercise" (*Levine*, 39 NY2d at 515).

Indeed, the Constitution expressly provides:

> "Subject to the limitations contained in this [C]onstitution, the [L]egislature may from time to time assign by law new powers and functions to . . . commissions . . . and increase, modify or diminish their powers and functions. Nothing contained in this article shall prevent the [L]egislature from creating temporary commissions for special purposes"

(NY Const, art V, § 3). In the past, such commissions have proposed substantial revisions to substantive bodies of statutory law that were subsequently enacted by the Legislature.

For example, the constitutionality of the enabling act creating the temporary state commission to recommend a comprehensive revision and simplification of the penal law and the code of criminal procedure (the Bartlett Commission) was upheld under article V, § 3 (*see People ex rel. Dudley v West*, 87 Misc 2d 967 [Sup Ct, Kings County 1976]; L 1961, ch 346 [creating the Bartlett Commission]).

So too here, we conclude that the enabling act was a valid "assign[ment] by law [of] new powers and functions to" the Committee (NY Const, article V, § 3) even though this case is distinguishable from those involving the Bartlett Commission because the enabling act provided that the Committee's recommendations, unlike those of the Bartlett Commission, were to go into effect by operation of law, and without further action by the Legislature or opportunity for direct gubernatorial input. The Constitution expressly permits the Legislature to assign new powers and functions to such commissions, if constitutional. We now hold that an assignment is valid under article V, § 3 where the Legislature creates a temporary commission with a discrete purpose, and has not delegated the power to make the law or divested the executive branch of supervision but set standards on the exercise of authority through appropriate guidance sufficient to prevent the commission from intruding on the Legislature's law-making function. In the enabling act, the Legislature fulfilled its exclusively legislative function by exercising its "discretion as to what [the law] shall be" (*Levine*, 39 NY2d at 515)[6] and assigned a discrete and limited

---

[6] Our cases involving legislative nondelegation do not provide the controlling standard by which we review the constitutionality of the enabling act. However, in "recogniz[ing] that executive or administrative rulemaking may entail some policy selectivity without offending separation of powers doctrine, so long as the basic policy choices have been

objective to the temporary Committee—i.e., the Committee was tasked with determining initially if salaries are adequate and if not, recommending appropriate changes. The Legislature further provided standards[7] to govern the Committee in the exercise of its assigned authority and retained the authority to reject or modify the Committee's recommendations, as it deems appropriate, before those recommendations became effective.

Put differently, the Legislature has made the basic policy determination that salaries for its members, statewide public officials and agency commissioners must be "adequate" (L 2018, ch 59, part HHH, § 1) and directed the Committee to recommend prospective compensation increases for legislators and certain other state officers, in accordance with the standard set forth in the enabling act. The Legislature has not "delegate[d] power to enact or repeal laws, or to establish policies and standards" (Peter J. Galie & Christopher Bopst, The New York State Constitution, 113 [2d ed 2012]). Rather, the field in which the Committee's discretion was to operate was appropriately limited (*cf. Levine*, 39 NY2d at 515). Essentially, the Committee was to recommend salary figures for a limited number of state elected officials and state officers. Moreover, the enabling act provides the

---

made and articulated by the Legislature" (*Dorst v Pataki*, 90 NY2d 696, 699 [1997]), this Court has necessarily spoken to the essence of the exclusive law-making function that cannot be conferred to another body. Contrary to the dissent (dissenting op at 16-17), we believe that question is relevant here.

[7] Such standards are necessary because "the Legislature is powerless to delegate the legislative function unless it provides adequate standards. Without such standards there is no government of law, but only government by [individuals] left to set their own standards, with resultant authoritarian possibilities" (*Rapp v Carey*, 44 NY2d 157, 162 [1978]).

standards and policies that govern the Committee's exercise of its authority (*cf. id.*) via eight nonexclusive factors that the Committee was directed to consider in analyzing whether the salaries should be increased and that provided a framework within which the Committee was to perform its assigned function.[8]  The Committee's authority was further cabined by the requirement that it submit its report directly to the Legislature and the Governor, so that the Legislature could modify or reject the Committee's recommendations before they became effective.  Under these circumstances, the enabling act is valid under article V, § 3.

To be sure, the enabling act differs from other statutes creating temporary commissions in that the Governor, by signing the act, has agreed to constrain the executive's role in approving the recommended compensation increases for legislators and various executive state officers.  The enabling act is, in this respect, distinguishable from Laws of 2005 (ch 63, Part E, § 31), which created the so-called "Berger Commission" to recommend closure and consolidation of existing health care facilities.  The 2005 statute provided the Commission's report was submitted to the Governor and only upon

---

[8] The enabling act directed the Committee to "take into account all appropriate factors including, but not limited to:  the parties' performance and timely fulfillment of their statutory and Constitutional responsibilities; the overall economic climate; rates of inflation; changes in public-sector spending; the levels of compensation and non-salary benefits received by executive branch officials and legislators of other states and of the federal government; the levels of compensation and non-salary benefits received by comparable professionals in government, academia and private and nonprofit enterprise; the ability to attract talent in competition with comparable private sector positions; and the state's ability to fund increases in compensation and non-salary benefits" (L 2018, ch 59, § 1, part HHH, § 2 [3]).  Any additional factors considered by the Committee would, necessarily, have to be of a similar nature and kind to the factors listed in the statute.

gubernatorial approval did the report become effective by operation of law when the Legislature declined to pass a concurrent resolution rejecting it (*id.* § 31 [9]).  Here, in contrast, the Governor's approval of the Committee's report was not required prior to it becoming effective by operation of law.  Moreover, the Committee differs from the commissions created in 2010 and 2015 in that each branch of government independently appointed the members of those commissions, while the enabling act named the five members of the Committee, only four of whom served (*compare* L 2010, ch 567, § 1 [b] *and* L 2015, ch 60, Part E, § 3.1 *with* L 2018, ch 59, part HHH, § 1).

Because any "assign[ment] by law [of] new powers and functions to . . . commissions" is "[s]ubject to the limitations contained in [the state] constitution" (NY Const, art V, § 3), we must also consider whether the enabling act violates the separation of powers doctrine.  The separation of powers doctrine is "the bedrock of the system of government adopted by this State in establishing three coordinate and coequal branches of government, each charged with performing particular functions" (*Maron*, 14 NY3d at 258). "While the doctrine of separation of powers does not require the maintenance of three airtight departments of government, it does require that no one branch be allowed to arrogate unto itself powers residing entirely in another branch" (*Under 21, Catholic Home Bur. For Dependent Children v City of New York*, 65 NY2d 344, 356 [1985]).  Because "[i]t is the correlative oversight of each lawmaking Branch over one another—in essence a dependency, rather than a separation—that balances the overall power to protect the *public's* interests," the state constitution prohibits "the ultra vires surrender of power to any other Branch" (*Cohen v State of New York*, 94 NY2d 1, 13 [1999]).  Here, no such

surrender of power occurred. In signing the enabling act, the Governor assented, having no objection to the Legislature's determination of what the law should be, the specific members named to the Committee in the statute, or the process that tightly circumscribed the Committee's discretion. The Governor, of course, had the opportunity to express any objections by vetoing the enabling act, but did not do so. Nor did the Governor cede any authority to propose different legislation in the future or to veto future legislation.[9]

"[W]hen and where the Constitution requires the courts to act within prescribed authority, we do not hesitate to decide even the most sensitive governmental disputes" (*Cohen,* 94 NY2d at 15). In this case, absent a constitutional violation, it would be "unwise for the courts "to substitute our own determination for that of the Legislature even if we would have struck a slightly different balance on our own" (*id.* at 14-15).

## IV.

Our determination that the enabling act was a valid assignment of power to the Committee finds support in this Court's prior cases. Indeed, this Court long ago addressed the very issue we decide today in the context of judicial salaries and recognized that the

---

[9] We note that the Committee did not fully cut the Governor out of the compensation-setting process. Rather, the Committee recommended that the Governor set the salary of two tiers of Executive Law § 169 Commissioners within a specified range. Nevertheless, we caution courts considering the validity of enabling acts that result in the executive branch effectively waiving veto power or review over the actions of temporary commissions empowered to make recommendations inconsistent with existing statutes that such enabling acts should be closely scrutinized to ensure that the limitations on the scope of the authority assigned to the commission included in the legislation are appropriate under the circumstances to prevent such bodies from either intruding upon the Legislature's law-making function or rendering "the legislative power" immune to "executive supervision and control" (4 Lincoln, The Constitutional History of New York at 497).

Legislature may authorize, by statute, other governmental entities to determine whether

judicial salaries should be increased beyond the amount set by statute to the extent that

those entities may deem proper (*see Benvenga*, 294 NY at 530-531, citing Judiciary Law

former § 143; *see also* 4 Charles Z. Lincoln, The Constitutional History of New York at

595-596 [1906]).    Plaintiffs and the dissent provide us with no basis for distinguishing

judicial compensation from legislative or executive compensation in this respect.

In observing that the Legislature may authorize other governmental bodies to

determine whether an increase in judicial salaries was warranted beyond the level set forth

by statute, the *Benvenga* Court necessarily recognized that the Legislature could convey

the authority to "supersede" or modify the statute setting judicial salaries to that limited

extent.[10]  Similarly, here, because the enabling act properly empowered the Committee to

determine whether the salaries of certain state officers "warrant[ed] an increase" (L 2018,

---

[10] The dissent objects to our use of the word "supersede," rather than "repeal" (dissenting op at 11).  We use the word "supersede" because that is the word used by the Legislature in the enabling act itself (*see* L 2018, ch 59, part HHH, § 4 [2]).  The dissenters further object that we are "[u]nable to seriously contend that the Legislature itself repealed the preexisting statutes" (dissenting op at 11).  We do not make any such contention because we recognize that the preexisting statutes have not been repealed—the relevant statutes remain on the books.  Here, the Legislature conferred limited authority to determine whether the compensation of the state officers listed "warrant[ed] an increase" above the levels contained in the published statutes (L 2018, ch 59, part HHH, § 2 [2]).  The dissenters acknowledge that this Court approved of that practice in the context of judicial salaries (dissenting op at 29, citing *Benvenga*, 294 NY at 530) and they provide no convincing explanation for why legislative salaries should be treated differently or why this Court should not follow *Benvenga* under the doctrine of stare decisis (*see Matter of State Farm Mut. Auto Ins. Co. v Fitzgerald*, 25 NY3d 799, 819 [2015] ["Even under the most flexible version of the doctrine applicable to constitutional jurisprudence, prior decisions should not be overruled unless a compelling justification exists for such a drastic step" (internal quotation marks and citation omitted)]).

ch 59, part HHH, § 2 [2]), then by necessary implication the enabling act itself must be read to have provided that the Committee's recommendations would supersede the statutes setting forth the pre-existing salaries. In other words, in using the word "supersede" (L 2018, ch 59, part HHH, § 4 [2]), the Legislature simply made explicit that it was permitting the Commission to engage in the process that this Court endorsed in *Benvenga*. In any event, it was the enabling act itself, a duly enacted statute, that provided for the supersession of prior inconsistent statutes, not a "committee of unelected individuals who are not directly accountable to public opinion" (dissenting op at 26).

Moreover, such supersession was done for a narrowly defined purpose (*see generally McKinney*, 41 AD3d at 252 [upholding the validity of the act creating the "Berger Commission"]). Critically, the enabling act is not a broad assignment to a commission of the authority to revise general statutes governing a substantive body of law without the requirements that such revisions be approved by the Legislature and subject to review or veto by the Governor (*compare Hurley v Public Campaign Fin. & Election Commn.*, 69 Misc 3d 254 [Sup Ct, Niagara County 2020] [declaring unconstitutional L 2019, ch 59, part XXX, § 1, which created a Commission to make recommendations for new laws establishing a system of public campaign financing that would supersede existing Election Law and State Finance Law provisions unless the recommendations were modified or abrogated by statute] *with Dudley*, 87 Misc 2d 967 [Sup Ct, Kings County 1976] [upholding the validity of the enabling act creating the Bartlett Commission, because the Commission's report comprehensively revising the state's criminal statutes was to be submitted to the Legislature, which remained responsible for enacting the revised

statutes]).    Rather, the Legislature made the basic policy choice and authorized the Committee "'to fill in details and interstices and to make [narrow, limited] subsidiary policy choices consistent with the enabling legislation'" (*Dorst v Pataki*, 90 NY2d 696, 699 [1997], quoting *Matter of Citizens For An Orderly Energy Policy v Cuomo*, 78 NY2d 398, 410 [1991]) on an issue that we have previously recognized may be assigned.  That is, the assignment of authority here was not only consistent with our prior caselaw addressing judicial salaries (*see Benvenga*, 294 NY at 530-531; *see generally Larabee*, 27 NY3d at 472), but also tightly cabined by the terms of the statute.[11]

In that regard, "'[a] statute or legislative act is to be construed as a whole, and all parts of an act are to be read and construed together to determine the legislative intent'" (*Frank v Meadowlakes Dev. Corp*., 6 NY3d 687, 691 [2006], quoting McKinney's Cons. Laws of N.Y., Book 1, Statutes § 97).   Although a de-contextualized reading of the supersession clause could lead to the misimpression that it permits the Committee's recommendations to supersede any inconsistent provision of Executive Law § 169 and Legislative Law §§ 5 and 5-a, the clause itself provides that supersession will occur only "where appropriate" (L 2018, ch 59, part HHH, § 4 [2]).   In determining when supersession

---

[11] Inasmuch as the narrow scope of the enabling act is consistent with our prior instruction regarding the use of supersession to effectuate prospective judicial pay raises (*see Benvenga*, 294 NY at 530-531), we have no occasion to adopt a comprehensive test for determining when the enabling act of a temporary commission that provides for the supersession of certain terms in pre-existing statutes has crossed the line into an unconstitutional attempt to pass onto other bodies "powers inherently and exclusively legislative" (*Trustees of Vil. of Saratoga Springs*, 191 NY at 138) or interfered with the Governor's role as an "essential element of the legislative system" (4 Lincoln, The Constitutional History of New York at 458).

would be "appropriate," the clause must be read in tandem with the narrow, discrete assignment of authority to determine the adequacy of the compensation for the specified state officials.  Therefore, under the enabling act, supersession is permissible only where the Committee has determined that compensation is not adequate and would not extend to a general, substantive revision of the statutes at issue (*cf. Hurley*, 69 Misc 3d at 260-261).

In short, we hold that there has been no unconstitutional assignment of power to the Committee by the enabling act under the circumstances presented here.

V.

We further reject plaintiffs' argument that the enabling act violates the requirement that legislative salaries, as well as the salaries of the Comptroller and Attorney General, be "fixed by law" under articles III, § 6 and XIII, § 7 of the New York Constitution.  This Court has not addressed the meaning of that phrase in depth, although we have noted that the Legislature's practice subsequent to amendment of the Constitution in the 1940s was to "fix" legislative salaries via enactment of a "general law provision" (*New York Pub. Interest Research Group v Steingut*, 40 NY2d 250, 256 [1976]) and that the "constitutional constraints do not generally prohibit prospective [compensation] adjustments" (*Cohen*, 94 NY2d at 9).  However, federal case law interpreting the Ascertainment Clause of the United States Constitution, which states that "[t]he Senators and Representatives shall receive a Compensation for their Services to be ascertained by Law" (US Const, article I, § 6), is helpful on this question.

*Pressler v Simon* (428 F Supp 302 [D DC 1976], *affd sub nom Pressler v Blumenthal*, 434 US 1028 [1978]) involved challenges both to a 1967 statute that

authorized the creation of a quadrennial commission to make recommendations to the President regarding rates of compensation for members of Congress, federal judges and certain other federal governmental officers and to a separate act providing for automatic cost-of-living adjustments (*id.* at 303). After receiving the commission's report, the President was required to submit his recommendations as to the exact pay rate for those positions in the next budget message. Those recommendations would become effective 30 days later, i.e., they would supersede the previous salaries set by statute, unless one House of Congress specifically disapproved of the regulations or Congress enacted a statute establishing a different rate (*see id.*). Prior to enactment of the statute, "[f]or the almost 180 years since the ratification of the Constitution, the precise compensation of members of Congress was always fixed from time to time by specific legislation without legislative involvement by the President" (*id.*).

The D.C. District Court rejected the plaintiff's arguments that the challenged statutes violated either article I, § 1 of the Federal Constitution or the requirement of article I, § 6 that congressional salaries must be "ascertained by Law." Like the plaintiffs here, the plaintiff in *Pressler* urged that "Congress is required itself to fix its pay" in a statute "that specifically states the amount to be paid" and that this congressional "responsibility . . . cannot, in effect, be delegated or by-passed in the fashion provided by the" challenged legislation (*id.* at 305). The court refused to read the Ascertainment Clause so inflexibly, reasoning that the plaintiff's argument amounted to "essentially a matter of form rather than substance" because "when Congress passed the Acts governing its compensation it acted 'by law,'" as required (*id.*). The court concluded that the word "ascertain" does not

have "such a narrow and limiting effect that, as a matter of constitutional law, it was intended to prevent the Congress from developing rational procedures of this type for fixing congressional compensation by means other than enacting a specific statute fixing each pay change" (*id.* at 305-306). Following procedural history not relevant here, the Supreme Court summarily affirmed on direct appeal (*Pressler v Blumenthal*, 434 US at 1028).

In 1985, Congress amended the 1967 statute to eliminate the "legislative veto" device by which Congress could reject executive action through the disapproval of only one house, instead requiring a joint resolution passed by both houses and presented to the President for signature (*see Humphrey*, 848 F2d at 215). The D.C. Circuit upheld the statute as amended, reaffirming that "the Ascertainment Clause [i]s not to be read inflexibly so as to require Congress to establish specific figures in specific legislation. Rather, it suffice[s] that the procedures eventuating in the specific figures were set, i.e., ascertained, by law" (*id.*). The Court observed that "Congress retained ultimate power to set its pay through the already mentioned devices, such as rejection of the President's recommendations" (*id.* at 216). Inasmuch as the ultimate political responsibility to fix the salary of members of Congress remained with Congress itself, "the animating purpose of the Ascertainment Clause" was vindicated (*id.* at 215).

Similarly here, although the enabling act charges the Committee with the task of recommending compensation levels for various state officers, the Legislature and Governor both meaningfully participated in setting the salaries at issue and remain politically accountable for the Committee's actions because they enacted the statute that created the process involving the Committee, and the Committee's recommendations

acquired the force of law only in the absence of legislative action. That is, compensation is set according to the process set forth by the Legislature in a duly enacted statute signed by the Governor and, therefore, remains "subject to statutory regulation" within the meaning of the New York Constitution (4 Charles Z. Lincoln, The Constitutional History of New York 765 [1906]). Moreover, the purpose of the 1948 amendment to the Constitution to allow legislators to fix their own compensation "was to avoid 'repeat[ing] the error of inflexibility' that had resulted from 'fixing the compensation of legislators . . . in the Constitution,'" while maintaining such political accountability (*Dunlea*, 66 NY2d at 268, quoting New York State Joint Legislative Committee on Legislative Methods, Practice, Procedures and Expenditures, 1946 NY Legis Doc No. 31, at 170). To now read article III § 6, along with article XIII, § 7, "inflexibly so as to require [the Legislature] to establish specific figures in specific legislation" (*Humphrey*, 848 F2d at 215), as plaintiffs urge us to do would run counter to the purpose of the 1948 amendment. Inasmuch as the requirement in article III, § 6 that salaries be "fixed by law" was added to the State Constitution for the purpose of "empowering the Legislature to determine its own compensation '*as is done in Congress*'" (*Dunlea*, 66 NY2d at 268 [emphasis added]), we conclude that *Pressler* and *Humphrey* provide persuasive authority that "it suffice[s] that the procedures eventuating in the specific figures were set, i.e., [fixed] by law" (*Humphrey*, 848 F2d at 215).

This result is also consistent with New York law addressing judicial salaries, which have been required by the State Constitution to be "established *by law*" since 1846 (*see* 1846 NY Const, art VI, § 7 [emphasis added]; *see Maron*, 14 NY3d at 251; 4 Charles Z.

Lincoln, The Constitutional History of New York at 595-596 [1906]).  In concluding in

*Benvenga* that the Legislature may confer the authority to determine whether Supreme

Court Justices' salaries should be increased, even though those Justices "are State officers

whose compensation must be prescribed by the Legislature," the Court stated "that [such]

power has been recognized and exercised since 1852" (294 NY at 530, relying on *People

ex rel. Morris v Edmonds*, 15 Barb 529 [1853], *supra*).[12]   *Morris* explained that, in

mandating that judicial salaries be established by law,

> "[t]he [C]onstitution does not require that the amount of
> compensation shall be specified in any general statute. It calls
> for legislative action. That is the required basis, but the
> superstructure may be fashioned pursuant to such provisions as
> may be established by the [L]egislature. An act is as essentially
> accomplished by law when performed pursuant to a statute, as
> if consummated by the statute itself"

(*id.* at 533-534).  Those words, endorsed by this Court in *Benvenga* nearly 100 years after

they were written and echoed by the federal courts in *Pressler* and *Humphrey* over 100

---

[12] The Court noted that "[o]n five separate occasions during a period of nearly one hundred years, the Legislature has enacted legislation permitting the city to provide for additional compensation" for Supreme Court Justices (*Benvenga*, 294 NY at 534).  The Court's reference to that power being "recognized and exercised since 1852" (*id.* at 530) was an acknowledgement that the power that the dissent here assails as undermining the very structure of the lawmaking process has been exercised and upheld since the phrase "established by law" first appeared in the New York Constitution the mid-19th century. That this Court recognized the validity of such a power in 1945, one year before the amendment providing that legislative salaries must "be fixed by law" was proposed, is highly relevant to our understanding of the provision because it is a critical "circumstance[] and practice[] which existed at the time of the passage of the constitutional provision" (*Steingut*, 40 NY2d at 258).  Contrary to the assertions of plaintiffs and the dissent, the Legislature's practice since 1948 of "fixing" legislative salaries via enactment of a "general law provision" (*Steingut*, 40 NY2d at 256) does not dictate a conclusion that setting forth a salary in a statute is the only constitutional means of fixing legislative salaries.

years after *Morris* was handed down, remain authoritative today. After all, the constitutional provisions require legislative and judicial compensation to be fixed or established, respectively, "by law" (NY Const, arts III, § 6, XIII, § 7 and VI, § 25 [a]), not "by statute." Therefore, we decline to effectively overrule this long-standing interpretation of our State Constitution by reading the words "by law" in articles III, § 6 and XIII, § 7 to mean something other than what they have always meant in article VI, § 25 (a). The New York Constitution may indeed use the term "by law" at times to mean "by statute," but under the provisions at issue in this appeal, the term "by law" includes the valid assignment of the authority to determine whether the salaries of state officers should be increased.

VI.

Finally, we conclude that the Committee did not exceed its authority under the enabling act with respect to the recommended salary increases before us on this appeal. It is well settled that, where an agency or commission acts "in a manner not contemplated by the legislative body," the administrative actions will be struck down (*Greater N.Y. Taxi Assn. v New York City Taxi & Limousine Commn.*, 25 NY3d 600, 608 [2015]). At the same time, an agency or commission that is "a creation of a legislative body . . . possesses the powers expressly conferred by [that body in its enabling act], as well as those 'required by necessary implication'" (*id.*, quoting *Matter of City of New York v State of N.Y. Commn. on Cable Tel.*, 47 NY2d 89, 92 [1979]).

The Legislature directed the Committee to determine whether the salaries of certain state officials "warrant[ed] an increase" (L 2018, ch 59, part HHH, § 2 [2]), and that is what the Committee did. To the extent the Committee also observed that the New York

Legislature functions more like a full-time body than Legislatures in other states, the Committee did not purport to convert the New York Legislature into a full-time body. Rather, the Committee considered several of the statutory factors set forth in section 2 (3) of the enabling act, such as "the parties' performance . . . of their statutory and Constitutional responsibilities;" "the levels of compensation and non-salary benefits received by executive branch officials and legislators of other states and of the federal government;" and "the levels of compensation and non-salary benefits received by comparable professionals in government, academia and private and nonprofit enterprise." To the extent that the Committee recommended imposing limits on receipt of outside income after 2019, the question of whether those limits exceeded its statutory mandate is not before us on this appeal.

Similarly, the Committee did not exceed its authority by recommending a reduction in the number of tiers in the salary structure governing Executive Law § 169 officers. The Committee concluded that the then-existing six-tier salary structure was "out of date and cumbersome" and did not "reflect the current sense of the importance of the various agencies governed by these public servants." The Committee recommended simplifying the tier structure to "to better reflect scope of responsibility, complexity, budget and workforce based on current data and account for ranges of income." Because the enabling act provided the Committee with the authority to examine the adequacy of the relevant officials' compensation and the tier structure governs that compensation, the recommendation to reduce the number of tiers was "not inconsistent with the statutory language or its underlying purposes" (*Greater N.Y. Taxi Assn.*, 25 NY3d at 608 [internal

quotation marks and citation omitted]).  Rather, the recommendation of reducing the tier structure to better reflect the workload of section 169 officers was simply a method to achieve the enabling act's stated policy goal.  Likewise, the Committee's recommendation of salary ranges for Tier C and Tier D Commissioners cannot be said to be in conflict with the enabling act inasmuch as that recommendation is related to the statutory factors of the state's "ability to attract talent in competition with comparable private sector positions; and the state's ability to fund increases in compensation and non-salary benefits" (L 2018, ch 59, part III, § 2 [3]).

## VII.

In sum, plaintiffs have failed to overcome the presumption of constitutionality accorded to the enabling act.  Moreover, the Committee did not exceed its authority under the statute.  Accordingly, the order of the Appellate Division should be affirmed, with costs.

WILSON, J. (concurring):

In his 1965 Benjamin N. Cardozo memorial lecture, Chief Judge Charles Breitel—then a Justice of the Appellate Division—explained that the three branches of government could not easily be hived into "mutually exclusive compartments," each with its own

function (Charles D. Breitel, *The Lawmakers*, 65 Colum L Rev 749, 764 [1965]).  Rather, it was their collaboration in the lawmaking process that made the "system of checks and balances" work (*id.*).  Although we are not "a parliamentary government where the Executive branch is also part of the Legislature," (*People v Tremaine*, 281 NY 1, 12 [1939]), Judge Breitel reminded us that "lawmaking . . . viewed broadly in order to see the forest in which the trees grow, fall[s] into no neat classifications" (Breitel, 65 Colum L Rev at 764-765).  Only when the branches of government are healthily balanced can the lawmaking ecosystem flourish.

That same year, the Ideal Toy Company introduced the game *Tip-It*, "the wackiest balancing game ever" (Library of Congress, Catalog of Copyright Entries: Third Series, Books and Pamphlets Including Serials and Contributions to Periodicals, July-December 1965, at 1790 [1968]).  In *Tip-It*, three equal posts were located equidistant from each other around a structure balanced on a center support, with a much taller post in the center, atop which a toy man balanced upside down on his nose.  Players tried to remove weights of a randomly prescribed color from one of three posts without tipping the balance too far in any direction, which required shifting weights from post to post to obtain the prescribed color without toppling the delicately balanced man.  Although the man could endure some swaying and leaning, maintaining balance was key.

Today, both authorities guide us as we ensure the balance of power is not "tipped irretrievably in favor of" any one branch (*cf. Anderson v Regan*, 53 NY2d 356, 366 [1981 plurality]).  It is our job to ensure that the players in the lawmaking process do not shirk

their burden of overseeing one another and minding the public interest.      I concur in the result reached by the plurality: the Committee on Legislative and Executive Compensation (the "Committee") acted permissibly pursuant to a constitutional statute (L 2018, ch 59, part HHH ["Enabling Act"]), which authorized the Committee to set "adequate levels of compensation" (Enabling Act § 1) for legislators and certain public officers.   However, I arrive at my conclusion concerning this unusual, if not wacky, statutory scheme through reasoning that differs from that of the plurality.   Although the Governor signed the Enabling Act, the Act itself prevented the Governor from initiating any further involvement in the legislative and public officer compensation process (except to the extent that the Committee's ultimate decision afforded the Governor modest discretion within the ranges of certain tiers for some executive officers).   The removal of gubernatorial input, even though initially ceded by the Governor, is particularly concerning in the context of legislative compensation because it leaves the Legislature as the only governmental guardian of the public fisc in matters of its own salary.

The plurality concludes that this scheme does not unconstitutionally vest legislative power in other bodies (*see* plurality op at 12).  My concern with the Enabling Act is not that the Legislature has ceded its authority to another body.  Indeed, this is not a difficult case under our legislative nondelegation doctrine.  Rather, the Enabling Act is troubling because it heavily constrained the executive's role in a process where his influence was especially important.[1]   The plurality spends much of its opinion applying caselaw that

---

[1] Both the plurality and the dissent share some of my concern about the loss of executive superintendence (*see* plurality op at 16 n 9; dissenting op at 8, 17).  But we do not

scrutinizes legislative attempts that may have overly empowered the executive.  But our doctrine of legislative nondelegation—designed to ensure that the "legislative power of this state" not be unconstitutionally divested from the "Senate and the Assembly" (NY Const, art III, §1; *see generally Matter of Levine v Whalen*, 39 NY2d 510, 515 [1976])— does not easily apply, *mutis mutandis*, to questions of the diminishment of executive power, which are the important questions raised by the Enabling Act.  As we counseled in *Matter of Maron v Silver*, "[s]eparate budgets, separate articles in the Constitution, and separate provisions concerning compensation are all testament to the fact that each branch is independent of the other" (14 NY3d 230, 259 [2010]).  In *Maron*, we engaged in an analysis suited to the judiciary's "unique place in the constitutional scheme" to decide whether a judicial compensation statute violated our separation of powers doctrine (*id*.).  We must conduct a similar inquiry for the Governor's role in legislative and statewide official compensation as well.

In brief, I find that the Enabling Act substantially weakens the Governor's ability to check excessive legislative and executive compensation.  I am satisfied, though just barely, that a narrow construction of the guideposts coupled with heightened judicial scrutiny (that is, refusing to afford the usual deference we give to the decisions of executive branch agencies) is sufficient to address the difficult separation of powers problem posed by this statute.   Providing  the  Governor  a  decision  point  after  the  Committee  makes  its

---

understand legal the nature of the problem of executive nonparticipation the same way, nor do we apply the same standard of review of the Committee's actions.

recommendations, as was done with the Berger Commission, would have removed all constitutional doubt.

## I.

We have long held that "[l]egislative enactments are entitled to 'a strong presumption of constitutionality'" (*Dalton v Pataki*, 5 NY3d 243, 255 [2005], quoting *Schulz v State of New York*, 84 NY2d 231, 241 [1994]).  We "strike them down only as a last unavoidable result" (*White v Cuomo*, 38 NY3d 209, 216 [2022], quoting *Matter of Van Berkel v Power*, 16 NY2d 37, 40 [1965]), and only where "every reasonable method of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible" (*White*, 38NY3d at 216, quoting *Matter of Fay*, 291 NY 198, 207 [1943]).  Although the Enabling Act requires more reconciling than most legislative enactments, we can sufficiently ensure that its structure does not overcome the "appropriately heavy burden" imposed on those who would hold a law unconstitutional (*People v Viviani*, 36 NY3d 564, 576 [2021]).

## A.

The judiciary has blessed various forms of nongovernmental or quasi-governmental entities for setting public compensation.  Here, though, in creating and empowering the Committee, the Legislature has departed from established precedent by weakening time-honored procedural safeguards.

For much of New York's recent history, the compensation of judges, legislators, and numerous state public officials were outlined in statutes that were intermittently

updated by the Legislature.[2]  The result was a halting process whereby the Legislature

would not update pay for decades and then pass large, politically controversial raises once

inflation had embarrassingly eroded government salaries.  William G. Joyce, the executive

director of the New York State Motor Truck Association perhaps explained the situation

best when he observed in response to a 1998 pay increase that "[i]f legislators and

commissioners had received a 3-4% increase each year over the last ten years there may

not have been the outcry that we see and hear in the media today" (Letter from William G.

Joyce to James McGuire, Dec. 10, 1998, Bill Jacket, L 1998, ch 630 at 11).  He proposed

---

[2] As the plurality notes, New York has historically embraced other compensation practices as well (*see, e.g.*, plurality op at 2 n 1[describing legislative compensation practices]). Most notably, since at least the mid-nineteenth century, we have approved legislative attempts to create a "superstructure" by which judicial compensation decisions might be made (*see* plurality op at 24, quoting *People ex rel. Morris v Edmonds*, 15 Barb 529, 534 [1853]). We have also allowed the presiding justice—the "designated representative" of the legislature—to authorize a "reasonable sum . . . as compensation for the expenses and disbursements" to non-resident justices who were designated to sit in the First Department (*see People ex rel. Follett v Fitch*, 145 NY 261, 262-266 [1895]). Even further back, the Legislature authorized judges to take fees as part of their compensation (*see, e.g.*, L 1818 ch 195, § 4), before the 1846 Constitution introduced the "established by law" requirement for the judiciary and explicitly prohibited fee taking in a separate section (*compare* 1846 NY Const art VI, § 7 [requiring compensation to be "established by law" for certain judges and justices] *with* 1846 NY Const art VI, § 20 [prohibiting any "judicial officer, except justices of the peace" from taking fees for personal use]). These and similar fee structures were gradually abolished as part of a state- and nationwide trend away from facilitative payments, which were increasingly thought to be "corrupt," to overcompensate public servants, and to distort incentives (*see generally* Nicholas R. Parrillo, Against the Profit Motive: The Salary Revolution in American Government, 1780-1940, at 114-124 [2013]).

Nevertheless, the supplementary compensation schemes of the nineteenth century typically added compensation on top of a salary scheme that was also outlined in statutes (*see generally* 4 Charles Z. Lincoln, The Constitutional History of New York 494, 593-598 [1906]).

"finding a means to ensure that salaries remain commensurate with economic conditions without forcing a vote on this issue after each legislative election" (*id*. at 11).

As the plurality notes, the Legislature established the Special Commission on Compensation (the "Commission") (*see* L 2010, ch 567), in response to our decision in *Maron* (14 NY3d 230), which declared as unconstitutional a policy of linking judicial compensation to unrelated policy initiatives (*see* plurality op at 5). In *Maron*, we said that "we expect[ed] appropriate and expeditious legislative consideration" of judicial salaries (14 NY3d at 263). The 2010 act addressed our charge by providing that a newly constituted Commission would meet every four years "to ensure that the proper salary level is set on a regular basis" (Senate Introducer's Mem in Support, Bill Jacket, L 2010, ch 567 at 8).

Importantly, the Commission was designed with an eye towards maintaining the checks and balances associated with the statute-making and budgetary process outlined in the Constitution (*see* Senate Introducer's Mem in Support, Bill Jacket, L 2010, ch 567 at 8). For instance, each branch of government appointed members to the Commission, many of whom could not be state employees or members of the state bar (L 2010, ch 567, § 1 [b]). Furthermore, the Commission provided information to each branch, which could check the Commission if it overreached: after its deliberations, the Commission would send a report containing its "findings, conclusions, determinations and recommendations" to the Governor, Legislature, and Chief Judge, and, if not modified or repealed by April 1 of the year as to which the recommendation applied, the recommendations would have the force of law unless overruled by statute (*id*. § 1 [h]). Looking back on this system in 2016, we observed that "through this legislatively-created process, the issue of judicial

compensation now receives consideration independent of other political matters" (*Larabee v Governor of the State of N.Y.*, 27 NY3d 469, 472 [2016]).

In 2015, the Legislature and the Governor expanded the ambit of the Commission to include compensation for legislators, statewide elected officials, and certain other state officers (*see* L 2015, ch 60, part E, § 2.1). Like its predecessor, this expanded Commission included a series of checks and balances designed to emulate those outlined in the Constitution. For instance, it retained the previous appointment system, giving each branch a set number of appointees not subject to the approval of other branches (*see* L 2015, ch 60, part E, § 3.1). Recognizing the heightened perils involved in legislative and executive compensation setting, the political branches provided heightened checks when considering those salaries: for "any matters regarding legislative or executive compensation," the chair—appointed by the judiciary—would not be able to vote (*id.*). Importantly, that recusal meant that the Governor's appointees could not be as easily overruled (*see id.* §§ 3.1, 3.7). Nor could the Governor steamroll the other branches, as all such recommendations would require the vote of at least one member from each appointing authority (*id.* § 3.7; *see also* L 2019, ch. 59, part VVV [requiring this procedural protection be applied to all recommendations instead of only those covering legislative or executive compensation]).

The 2015 Commission succeeded in issuing recommendations concerning judicial compensation but failed to issue any recommendations concerning legislative or executive salaries before its term expired. Therefore, the Governor and Legislature enacted the Enabling Act that is at issue in this case. Like the Commission, the Committee created by

the Enabling Act had discretion to recommend compensation changes for legislators and certain executive branch officials (*see* Enabling Act, §§ 1-3). Once it issued its "recommendation," the Committee's decision would "have the force of law" unless repealed by a statute (*id*. § 4.2). However, the Enabling Act weakened the checks and balances that had constrained the Commission. For instance, its five appointees (only four of whom ultimately served) were named in the statute instead of selected directly by members of the relevant branches (*see* Enabling Act, § 1).[3] Most notably, the Enabling Act removed the provision in the 2015 law which had given the Governor's appointees half of the votes on matters of legislative and executive compensation, and it further relaxed the requirement that one appointee from each branch had to sign on to all recommendations involving legislative and executive compensation. Unlike its predecessor statutes or those creating other force-of-law commissions (*see, e.g.*, *St. Joseph Hosp. of Cheektowaga v Novello*, 43 AD3d 139, 143 [4th Dept 2007], *appeal dismissed* 9 NY3d 988 [2007], *lv denied* 10 NY3d 702 [2008] [upholding the Berger Commission, whose recommendations "would not be implemented" unless the Governor transmitted the Commission's report to

---

[3] The Enabling Act envisioned a five-member Committee consisting of "the chief judge of the state of New York" (then Janet DiFiore), "the comptroller of the state of New York" (Thomas P. DiNapoli), "the chairman of the State University of New York board of trustees and 52nd comptroller for the state of New York (H. Carl McCall), "the comptroller for the city of New York" (then Scott M. Stringer), and the chairman of the city university of New York board of trustees and 42nd comptroller for the city of New York (William C. Thompson, Jr.) (Enabling Act, § 1). Chief Judge DiFiore did not serve on the Committee, however, so it only had four members.

the Legislature with his written approval]), the Enabling Act fully cut the Governor and his representatives out of the compensation-setting process after the Governor signed the Act.[4]

## B.

Due to its peculiar structure, the Enabling Act worked an unusual transfer of power. The prototypical challenges to legislative "delegation" involve statutes that risk excessively aggrandizing the executive branch by giving the executive branch the kind of sweeping authority that belongs to the legislature.[5] Here, the Enabling Act shifted power from the executive (as well as the legislature) into the Committee. Furthermore, that transfer of authority altered the balance of power between the legislative and executive branches, creating a situation where the Governor might be completely divested of legal authority to stop a lopsided appropriation to be paid directly to the legislators themselves. This *quis custodiet ipsos custodes* problem raises significant constitutional questions under

---

[4] The plurality notes that the *Committee* did not fully cut the Governor out of the compensation-setting process because it gave him limited authority to set the compensation for a subset of Executive Law § 169 commissioners (plurality op at 16 n 9). Although the fact that the relevant recommendations gave the Governor some additional authority over compensation renders those recommendations less suspect on executive power grounds, it does not address the fact that the Governor was still at the Committee's mercy with regard to the structure of the scheme itself.

[5] I use the word "delegate" here with caution, as the Legislature cannot delegate its authority: our Constitution vests "[t]he legislative power of this state . . . in the senate and assembly" and no one else (NY Const art III, § 1). The Legislature may, however, authorize others to take actions backed by the force of law. On occasion, such authorizations sweep widely enough that we must either narrow the construction of the statute to save it or else invalidate it as an unconstitutional delegation. Here I refer to the case law surrounding such statutes when I use the term "delegation" (*see generally LeadingAge New York, Inc. v Shah*, 32 NY3d 249, 281 [2018], Wilson, J., dissenting in part).

both the State Constitution's "fixed by law" requirements (art III, § 6; art XIII, § 7) and by extension our "[s]eparation of [p]owers [d]octrine" (*Maron*, 14 NY3d at 244).[6]

The structure of the New York Constitution reflects its concern about the "conflict of interest" associated with public officials setting their own salaries (*see New York Pub. Interest Research Group, Inc. v Steingut*, 40 NY2d 250, 258 [1976]). The most direct check it places on legislators is the requirement that a legislator's salary and additional compensation may not be "increased or diminished during, and with respect to, the term for which he or she shall have been elected" (art III, § 6; *see Steingut*, 40 NY2d at 258). But it also creates a subtler check when it dictates that the compensation of legislators and certain officials must be "fixed by law" (*see* art III, § 6; art XIII, § 7). Although "fixed by law" does not mean that the dollar amounts of relevant salaries must be stated in a statute, it does mean that the "two essential lawmaking bodies" (*Cohen v State of New York*, 94 NY2d 1, 12 [1999])—the Governor and the Legislature—must be meaningfully involved in the process. By contrast, the Constitution removes the Governor entirely from her own salary-setting process (and that of her lieutenant), instead requiring her salary "to be fixed by joint resolution of the senate and assembly" (art IV §§ 3, 6). The way to explain the

---

[6] Although the plurality notes (plurality op at 11-12) that the New York Constitution gives the legislature the power to "assign by law new powers and functions to . . . commissions," the fact that it must do so "[s]ubject to the limitations contained in this constitution" (art V, § 3) means that article V, § 3 cannot end the analysis of the issue. I agree with the plurality to the extent that article V, § 3 allows the legislature to create commissions, but that provision merely begins our analysis of the Enabling Act's constitutionality. Indeed, even the plurality notes that the legislature may assign new powers and functions to a commission only "if constitutional" (plurality op at 12).

disparate constitutional treatment of gubernatorial compensation on the one hand and the compensation of legislators and public officers on the other is to understand that "fixed by law" requires meaningful participation by both political branches of government. After all, gubernatorial assent (or legislative override thereof) is what distinguishes a joint resolution from law (*see* NY Const art IV, § 7).

This "separation of powers" approach to compensation represents one of the State Constitution's traditional responses to such conflicts of interest. Under the separation of powers doctrine, one branch of government may not "dominat[e] or interfer[e] with the functioning of another coequal branch" (*Maron*, 14 NY3d at 244). Separation of powers is a somewhat misleading moniker for a system that often aims to control government officials by "institutional interdependence rather than functional independence" (*Cohen*, 94 NY2d at 13-14, quoting Lawrence Tribe, American Constitutional Law 20 [2d ed.] [internal emphasis omitted]). Indeed, the Constitution "makes the Governor a part of our legislative system" and ensures that the "legislative power . . . vested in the senate and assembly . . . [is] subject to executive supervision and control" (4 Charles Z. Lincoln, The Constitutional History of New York 494, 497 [1906]; *see also* NY Const art IV, § 7). Incorporating the Governor into the lawmaking process helps protect New Yorkers from legislative overreach. As we have previously explained, "[i]t is the correlative oversight of each lawmaking Branch over one another—in essence a dependency, rather than a separation—that balances the overall power to protect the *public's* interests, not those individuals who occupy the offices of those Branches at varying times . . . ." (*Cohen*, 94 NY2d at 13).

Not only did the Enabling Act place the power to reject excessively generous Committee recommendations of legislative compensation exclusively with the Legislature, it created an additional conflict of interest. Namely, it placed initial compensation decisions in the hands of a four-person Committee, one of whose members had a financial stake in the outcome: as New York's Comptroller, Thomas DiNapoli was a "statewide elected official" (Enabling Act, § 2.1) whose salary was therefore in question.[7] Although Comptroller DiNapoli judiciously recused himself from those deliberations, nothing about the structure of the Committee required his recusal.

Given the particularly acute conflicts of interest associated with compensation, a proper system of checks and balances was especially important. Instead, the Enabling Act relaxed the established constitutional protections and introduced additional hazards.

**C.**

The Enabling Act's destabilization of the checks and balances in setting compensation is not so grave as if the Legislature had attempted to set its own compensation through a joint resolution (*cf. Matter of Moran v LaGuardia*, 270 NY 450, 452-453 [1936]). Nevertheless, it reduces gubernatorial authority significantly more than prior delegations to other committees and commissions.

---

[7] The mere fact that the Comptroller was in a position to "determine [what] legislators shall be paid" raises yet another separation of powers concern (*see Cohen*, 94 NY2d at 17 [defending the statutory scheme by explaining how it "in no way authorize[d]" the Comptroller to wield authority over when legislators were paid]). We have no occasion to address that issue because no party has raised it.

The Governor approved the legislation creating the Committee.  In signing the legislation, the Governor also had some capacity to approve or reject the members of the Committee, inasmuch as they were set forth in the text of the statute (*see* Enabling Act, § 1).  Indeed, the Governor further facilitated the process by issuing a message of necessity.[8]  On the other hand, unlike the 2015 authorizing legislation for the Commission, the Enabling Act did not give the Governor free rein to appoint whomever he pleased, as it explicitly listed the members of the Committee.  Such a limit on the Governor's appointment authority is concerning as a constitutional matter because it risks stripping the Governor of her appointment power and committing her to a single candidate chosen by the Legislature (*cf. Matter of Prospect v Cohalan*, 65 NY2d 867, 874-875 [1985], Titone, J., dissenting).  Nevertheless, the Governor approved the Enabling Act and exercised some control over its membership.

However, unlike prior commissions and committees, the Committee's recommendations automatically became law unless the Legislature blocked them, without any opportunity for the Governor or his direct representatives to intercede.  This structure

---

[8] Generally, the New York Constitution requires that legislation be available to legislators for three calendar days before it becomes law, unless the governor certifies facts that necessitate an immediate vote on the bill (*see* art III, § 14).  Because the budget bill with the Enabling Act in it was introduced on March 30, 2018 (*see* Budget Bill at 156, Bill Jacket, L 2018, ch 59), it could not be passed before the beginning of the fiscal year on April 1 without gubernatorial intervention.  Given our Constitution's appropriation requirement, failing to pass a timely budget can have serious consequences (*see* art VII, § 7).  Given the tight timeline and significant consequences of failure to pass a budget on time, the Governor issued a message of necessity to facilitate its quick passage (*see* Message of Necessity, Bill Jacket, L 2018, ch 59 at 14).

stands in distinct contrast to the Berger Commission, whose recommendations were transmitted first to the Governor, and which would proceed no further unless the Governor transmitted them to the Legislature (*see St. Joseph Hosp.*, 43 AD3d at 143).

Faced with substantial concerns about the Enabling Act, we must ask if it can be construed in a way that permits it to pass constitutional muster (*see White*, 38NY3d at 216). It can. To start, the structure of the Act itself heavily circumscribed the Committee's authority, articulated clear policy judgements, and subjected the Committee to searching review from the courts. The Committee's tightly cabined authority meant that its discretion reached minimally beyond what the Governor would have foreseen when he authorized the initial legislation, a process over which the Governor exercised constitutional control. Because the Governor exercised sufficient control over the process given the Committee's narrow authority, the compensation of state legislators and statewide elected officials was still "fixed by law" (art III, § 6; art XIII, § 7) and did not run afoul of our "[s]eparation of [p]owers [d]octrine" (*see generally Maron*, 14 NY3d at 260).

The Enabling Act's saving grace is that the Committee's decisions must be subjected to heightened judicial review. Given the constitutional precarity of the Enabling Act, we must subject the Committee to heightened scrutiny to ensure that the derogation of gubernatorial power is not excessive. As a general matter, we do not defer to the Committee's interpretation of its own jurisdiction because that is a pure question of statutory interpretation (*see Matter of Claim of Gruber*, 89 NY2d 225, 231-232 [1996]). Furthermore, where, as here, that jurisdiction is constitutionally suspect, we apply more stringent interpretive methods to "avoid, if possible, interpreting a presumptively valid

statute in a way that will needlessly render it unconstitutional" (*Overstock.com, Inc. v New York State Dept. of Taxation and Fin.*, 20 NY3d 586, 593 [2013], quoting *LaValle v Hayden*, 98 NY2d 155, 161 [2002]).  We therefore look not to the most natural construction of the statute, but the interpretation that avoids constitutional impropriety.  Indeed, a "tincture of constitutional doubt" may help us stomach an otherwise unpalatable interpretation (*see Matter of Jacob*, 86 NY2d 651, 680 [1995], Bellacosa, J., dissenting).

This heightened scrutiny requires us to read the Enabling Act narrowly.  First, the Committee's jurisdiction was highly cabined, limited to recommending specific amounts of "compensation, non-salary benefits, and allowances" for statewide elected officials and for the limited set of officials within two clearly defined statutory provisions, section 5-a of the Legislative Law and section 169 of the Executive Law (Enabling Act, § 1).[9]  Second, the Committee's jurisdiction was circumscribed by eight nonexclusive factors (Enabling Act, § 2.3).[10]  Thus, not only did the Enabling Act limit the authority of the Committee to setting a small set of compensation numbers for a discrete number of governmental

---

[9] The Committee's recommendations also included limits on outside compensation and activities, but Supreme Court and the Appellate Division struck those recommendations, and the State has chosen not to challenge those rulings (2019 NY Slip Op 32723[U], 11-16 [Sup Ct, Albany County 2019], *affd* 194 AD3d 98; *see also Barclay v New York State Comm. on Legislative and Exec. Compensation*, 65 Misc3d 685, 701-703 [Sup Ct, Albany County 2019] [finding the recommendations on outside income restriction were advisory and did not take on the force of law]).  Thus, all that is at issue here is the compensation for legislators and specified executive branch officers.

[10] Under the canon of *ejusdem generis* (backed by constitutional avoidance), even though the factors are termed "nonexclusive," we may read these factors as constraining the otherwise open-ended delegation of "all appropriate factors" to factors that are similar to those enumerated (*see People v Illardo*, 48 NY2d 408, 416 [1979]).

officials, it created justiciable limits on the type of reasons the Committee could consider, as the court below demonstrated by engaging with a challenge to the Committee's reasoning (*see* 194 AD3d 98, 106 [3d Dept 2021] [considering whether the Committee exceeded its jurisdiction by finding that the Legislature functioned more as a full-time body]).

These jurisdictional limits are important because they ensure that the Committee may only make the kind of decisions expressly contemplated and approved by the Governor. Were the Committee to set rates of compensation that substantially exceeded (or fell short of) what a court decided would be "adequate" based on the enumerated and similar factors (Enabling Act, § 1), heightened judicial scrutiny would substitute for the Governor's inability to rein in a runaway Committee.[11]

Even under this heightened standard of review, the Committee did not, as appellants suggest, exceed its authorization when it gave the Governor a small amount of discretion to set some executive officer compensation (*see also* dissenting op at 13).[12] Given that the

---

[11] Petitioners here do not contend that the salaries set by the Committee are excessive when measured against the enumerated factors; their complaint is purely about the unconstitutionality of the process, not the result. Supreme Court and the Appellate Division have demonstrated their vigilance in protecting the public in view of the Enabling Act's diminishment of executive authority, and petitioners' lack of complaint about the level of the salary increase to some degree confirms that vigilance.

[12] In its compensation recommendations for C- and D-tier Executive Law commissioners, the Committee allowed the governor to choose within a tightly constrained range of options. For D-tier commissioners, compensation was $140,000-$170,000, while for C-tier commissioners, the salary was $175,000-$200,000. Furthermore, the governor was not permitted to decrease compensation during the same term of a specific commissioner

constitutional concern—and the correspondingly heightened review—is motivated by the limitation of the Governor's role in the decision-making process, the grant to the Governor of some salary discretion within modest ranges tips the scheme somewhat back into balance. Moreover, this additional authority was not so unprecedented or unexpected that the decision was beyond the pale of what the Governor authorized or might have anticipated. The Executive Law regularly permits the Governor to set specific compensation within much wider ranges (*see, e.g.*, Executive Law §§ 52 [5]; 57; 260; 271; 642). Executive Law § 169 even delegates some compensation-setting to non-gubernatorial officials (*see* § 169 [3]). Although the Committee did not have carte blanche to design a complex set of rules or institutions for setting compensation, it did have the ability to set a statutory minimum and maximum and provide some discretion to the Governor using a familiar statutory regime.

## II.

I turn next to two of the arguments advanced by my dissenting colleagues. First, they contend that the Enabling Act's supersession clause (§ 4.2) constitutes an unconstitutional delegation of legislative power. But this statute is not a hard call under our existing legislative nondelegation doctrine, and the supersession clause does not change that analysis.

---

unless it was part of an across-the-board reduction applied evenly to all commissioners in the tier.

Second, the dissent argues that the State Constitution's "fixed by law" provisions (art III, § 6; art XIII, § 7) require that the salaries of legislators and statewide elected officials be explicitly enumerated in statute. That reading is possible but finds limited support in the history of the provisions and does not accord with the broader principles embodied in the Constitution. A better reading of those provisions is that they require meaningful input from the two lawmaking branches (*see supra* at 10-13), but still permit the branches to authorize inferior bodies to exercise some amount of discretion.

**A.**

The dissent misapplies our familiar nondelegation jurisprudence when it argues that the Enabling Act delegated the power to repeal statutes to the Committee. Although the legislature may not divest itself wholesale of the power to repeal general statutes, we do not infer that the legislature has done so unless it speaks clearly (*see Matter of Benvenga v LaGuardia*, 294 NY 526, 533 [1945]). In contrast to the dissent's proposition that "[n]o [safeguarding] 'standards' can excuse" the supersession clause (dissenting op at 17), the supersession clause, in the context of this statute, is functionally inconsequential.

Under the dissent's framework, the legislature could have passed an almost identical piece of legislation to accomplish the same end. Suppose the legislature has passed a law setting the compensation of all Executive Law § 169 commissioners as "adequate, as determined by the Committee after taking into account all appropriate factors including, but not limited to" the factors outlined in the Enabling Act. Had the legislature passed such an act, a court would presume that the elements of Executive Law § 169 that were inconsistent with the hypothetical statute and the Committee's corresponding

recommendations would be repealed by implication (*see People v Mann*, 31 NY2d 253, 268 [1972]).   In other words, the supersession clause adds nothing to the dissent's constitutional argument: if the Committee had been structured exactly as the Berger Commission was (that is, so that its structure was decidedly lawful), its recommendations would supersede inconsistent laws with or without a supersession clause.

The problem with the dissent's blanket prohibition on supersession clauses is that it is unmoored from the problems the relevant constitutional provisions were designed to address.   As a result, it is difficult to figure out what types of familiar legislative actions are constitutionally suspect under the dissent's analysis.   When we interpret the structure and language of a constitution, we ask what the provision aimed to accomplish and interpret the text in that light (*see Steingut*, 40 NY2d at 258).   The dissent begins with the familiar proposition that bicameralism and presentment promote transparency and deliberative decision-making (*see* dissenting op at 7-8), but it quickly loses sight of those values in its rush to condemn supersession clauses.   The regime created by the Enabling Act is no less deliberative or transparent than the permissible hypothetical statutory scheme outlined above and we should treat it the same way we would the hypothetical act.

The supersession clause at issue here is amenable to our well-established test for deciding whether the legislature has unconstitutionally delegated the "power to make the law," or whether the contested statutory provision merely "confer[s] authority or discretion as to a law's execution" (*Levine*, 39 NY2d 510, 515).   I do not need to retread the plurality's application of this doctrine (*see* plurality op at 11-14).  Suffice it to say that this

supposed delegation of lawmaking authority is far narrower than others we have upheld (*see, e.g.*, *Levine*, 39 NY2d at 516).

Supersession clauses do not raise novel constitutional problems from a legislative nondelegation perspective. They do not inherently delegate the power to repeal or supersede existing statutes, even though they sometimes authorize courts and public officials to strike a law from "the books" (dissenting op at 13, quoting plurality op at 17 n 10)—books which are themselves assembled under delegated authority (*see* Public Officers Law § 70-B [1]). Rather, the authorizing statute repeals or supersedes the inconsistent laws and the other government entities apply the statute's directives.

The fact that a law explicitly makes supersession contingent on the judgment of another person or entity does not change that analysis, as the dissent's own authority explains. When the legislature passes a law, it may "provide that [the law] shall take effect at some future period or upon the happening of some future event" (*Corning v Greene*, 23 Barb 33, 49 [Sup Ct, Albany Gen Term 1856]). That "future event" may include another entity expressing its disapproval. Thus, the legislature may "provide that the law should cease to exist, unless a party affected by it performed an act evincing consent to its provisions" (*id*. at 52 [upholding as constitutional a provision that a statute would not come into effect unless the corporation of the city of Albany consented to the bill]).

Although the dissent claims that "we have never approved a delegation of the power to 'supersede' duly enacted statutes," we in fact regularly afford inferior bodies considerable discretion about which statutes to repeal or supersede (dissenting op at 12). Statutes often do not explicitly provide for the "complete and automatic repeal" of

inconsistent legislation (dissenting op at 10), and the legislature implicitly or explicitly authorizes other entities to implement its will. Thus, we often decide whether there is "an inconsistency between the statutes which is such as to preclude giving effect to both" (*Mann*, 31 NY2d at 268) in our own doctrine of implicit repeal, which does not seem to bother the dissent (*see* dissenting op at 10). It is not clear whether the dissent would also invalidate the common legislative practice of passing laws that supersede or repeal any other inconsistent laws (or permit other existing laws to supersede them) but do not specify the laws to which they refer. The dissent might read such a practice as an explicit delegation of the power to repeal statutes to the courts or relevant officials charged with compiling and enforcing them (*see, e.g.*, Vehicle and Traffic Law § 385 [20] ["Any such law, statute, ordinance, rule or regulation . . . shall to the degree inconsistent hereafter be deemed null and void and shall not be enforced"]; General Business Law § 392-h; Public Authorities Law § 2050-pp; State Finance Law § 97-oooo [3]).

Legislation regularly leaves decisions about the "concrete condition upon which 'supersession' [will] occur" to the "discretion" of non-legislative bodies (dissenting op at 10). For instance, we have twice approved regulations passed pursuant to General Obligations Law (GOL) § 13-101 (3), which permits the transfer of claims except as restricted by statute or where transfer "would contravene public policy" (*see Matter of Medical Socy. of State of N.Y. v Serio*, 100 NY2d 854, 871-872 [2003]; *Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals Trib.*, 2 NY3d 249, 258 [2004]).[13]

---

[13] The dissent claims that these cases do not concern supersession (dissenting op at 12 n 4) but does not explain why the statute there at issue—which authorizes courts and agencies

Courts have also explicitly blessed supersession clauses in our local government law (*Matter of Sherman v Frazier*, 84 AD2d 401, 407-408 [2d Dept 1982]; *see also Kamhi v Town of Yorktown*, 74 NY2d 423, 429-434 [1989] ["When municipalities act within their supersession authority, even local laws that are inconsistent with the Town Law may be valid . . . . [W]e hold that permitting the town to supersede Town Law § 274-a in its local application . . . fits comfortably within [Municipal Law] section 10"]; *Turnpike Woods, Inc. v Town of Stony Point*, 70 NY2d 735, 737 [1987]). Supersession is routinely applied in our fire safety regulations, facilitating a statutory scheme that "reconcile[s] and consolidate[s] existing fire prevention and structural regulations into a single, uniform code . . . throughout the State" (*cf Tarquini v Town of Aurora*, 77 NY2d 354, 359 [1991] [speaking about the scheme broadly though not addressing supersession]; *see generally* Executive Law § 383 [1]; Labor Law § 275; *People v Oceanside Inst. Indus., Inc.*, 15 Misc 3d 22, 25 [App Term, 9th and 10th Jud Dists 2007] [enforcing a supersession clause]; *Sowa v Zabar*, 67 Misc 3d 1237[A], 2020 NY Slip Op 50772[U] [Sup Ct, NY County 2020] [same]).

The dissent counters that "the Committee 'superseded' far more than just a salary figure. It . . . . reorganized the statutory tier structure from six tiers to four and reclassified

---

to overrule the statute's general decree that claims be transferrable whenever courts and agencies decide transfers would contravene public policy—is not an instance of supersession. Presumably under the dissent's logic, the Enabling Act would have been constitutionally permissible had it merely said that salaries would be as written in the statute "unless such salaries would contravene public policy, in which case they will be set as appropriate by the Committee."

officers among the tiers" (dissenting op at 13). The dissent does not explain what, if any, legal implications the tier structure had aside from its effect on compensation. The "tier structure" was simply a shorthand way of listing the amount to be paid to each enumerated officer. If the Committee had first listed the pay of each officer in a dollar amount, one by one, and then observed that 20 of them were at $120,000 annually, and called that "Tier C," what legal significance, in the context of "fixed by law," could that possibly have? Under the dissent's view, the Committee's recommendation would be less problematic had it set the compensation of all tiers equal to one another, effectively nullifying the entire structure; indeed, the Committee's action would have been less problematic for the dissent had it scrambled their order, giving Tier E commissioners the most, Tier A commissioners the third-most, and Tier B commissioners the least, provided it did not also update their names to put them in alphabetical order. It is hard to articulate why adjusting a shorthand way of referring to salaries—with no legal significance beyond the dollar amount to be paid to a particular employee—would change "far more than just a salary figure" such that it would raise independent constitutional concerns (dissenting op at 13).

The Legislature specified what it wanted and left the Committee to execute its vision. It put in place safeguards to ensure that the Committee's discretion was not so wide ranging as to constitute independent policy judgment. Nothing about the Enabling Act's supersession clause raises any novel or unprecedented legal issues in regard to our legislative nondelegation doctrine. Holding otherwise would call into question at least a century of jurisprudence and settled legislative practice.

**B.**

The dissent is closer to the mark on the whether the Enabling Act was consistent with our Constitution's "fixed by law" requirements (art III, § 6; art XIII, § 7). I agree with the dissent that federal precedent on an analogous provision of the Federal Constitution, which was made after the relevant amendments to our Constitution were adopted, is persuasive at best (*see* dissenting op at 27-28). Our Constitution has a separate history and structure and must be interpreted accordingly (*see id*. at 28). I also agree with the dissent that "fixed by law" might, in some contexts, mean "fixed by statute" (*see* dissenting op at 24-25).

The fact that "fixed by law" might mean "fixed by statute" does not end our analysis, however. In the context of the relevant constitutional provisions, we would need to ask which meaning of "law"—statute or something more capacious—the Constitution was using. Indeed, it is common in both the Constitution and our case law to use "law" or "fixed by law" to refer to an order "established by competent authority" (*Matter of Mutual Life Ins. Co.*, 89 NY 530, 533 [1882]; *cf.* 1 William Blackstone, Commentaries on the Law of England at *69 [William Carey Jones ed 1915] [adopting an influential declaratory theory of law]).[14] Even assuming that the Constitution uses the term "law" to mean "statute," in the sections in question, we would then need to ask whether a statute that

---

[14] Construing the term "law" to mean "statute" and to exclude regulations, ordinances, or judicial decisions throughout the Constitution would lead to incongruous results (*see, e.g.*, NY Const art I §§ 6 [the power of grand juries to inquire into the conduct of public officers "shall never be suspended or impaired by law"], 14 ["Such parts of the common law, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony . . . . shall be and continue the law of this state"]).

permits some discretion to non-legislative actors would suffice to fix compensation. The dissent's own authorities suggest that "fixed by law" does not preclude providing discretion to other parties.[15] As the dissent notes, the court in *Healey v Dudley* stated that "law" meant "statute" in the context of a "fixed by law" provision, but that such a law could allow the inferior body some discretion if to the extent that the act taken by the inferior body was "obviously intended" by the legislature (dissenting op at 24, quoting 5 Lans 115, 119 [Gen Term, 4th Dept 1871]).[16] Unlike in the present case, the *Healey* court confronted a constitutional provision whose history made clear that the phrase "by law" was meant to wrest control away from county boards of supervisors, and it still allowed for the possibility that the legislative fixing might permit some discretion to inferior bodies (*see* 5 Lans at

---

[15] The dissent also relies on ambiguous dicta from *People ex rel. Percival v Cram* (164 NY 166 [1900]), but *Percival* is not helpful here (*see* dissenting op at 25). As the dissent notes, in *Percival*, we found that a statute did not apply to a dockmaster because he was an officer and therefore not covered by its provisions (*see* dissenting op at 25). Furthermore, the language of the constitutional provision referenced in dicta differs from the "fixed by law" requirement of article XIII, § 7 (*compare* NY Const art XIII, §§ 2 ["declared by law"], *and* 7 ["fixed by law"] *with* dissenting op at 28 ["*Pressler* interprets the word 'ascertain' . . . . (but) there is no dispute here as to the meaning of the term 'fixed' "]).

[16] I agree that the legislature may not delegate its authority, even if it "obviously intended" to do so (*see* dissenting op at 24 n 9; *see also supra* at 10 n 5). My point here is that the "fixing" required in the statute does not require the legislature to spell out the compensation in exacting detail in its statutes. Rather, the lawmaking branches might create general principles by which the compensation is fixed and leave the implementation to an inferior body, provided that their overall principles still guide the analysis. To the extent that this system reflects "basic principles of construction" (dissenting op at 24 n 9), it suggests that the lawmaking branches may fix compensation with the term "appropriate" accompanied by a set of relevant factors, and leave a delegee to implement the specific details pursuant to the statute's guiding principles and identified factors.

117-118).[17]  Even in the context of that provision, it is not clear that the legislature could not authorize some inferior bodies to exercise discretion over compensation.  Indeed, our broader judicial compensation jurisprudence has permitted the legislature to authorize some discretion over compensation in the past (*see, e.g.*, *supra* at 6 n 2).[18]

There is no such clarifying history here.  As the plurality notes, we have long recognized the importance of flexibility to the structure of the legislative "fixed by law" provision (*see* plurality op at 23, citing *Dunlea v Anderson*, 66 NY2d 265, 268 [1985]).  Although I agree with the dissent that flexibility is not the only concern embodied by this provision (*see* dissenting op at 26), the imperative for flexibility should color our interpretation.  In the absence of any authoritative historical evidence on this specific question, we are left to reason from the Constitution's text and structural principles.  The best way to balance the twin imperatives of flexibility and accountability is to ensure that

---

[17] *Brinckerhoff v Bostwick*, also cited by the dissent (*see* dissenting op at 25), was a case interpreting a statute with similarly clear statutory history (*see* 99 NY 185, 191 [1885] ["The construction we give to this [statute] is made quite obvious if we trace the history of the law embodied therein."]).

[18] Even *People ex rel. Noble v Mitchel* (220 NY 86, 90 [1917]), which cites *Healey*, is somewhat cryptic about the discretion that is consistent with a "fixed by law" requirement (*see* dissenting op at 25).  Although we agreed that the surrogate's salary "must be fixed by the legislature," we ultimately ruled that the surrogate's salary must be held in abeyance because it would have increased his compensation during his term in violation of the constitution (*Noble*, 220 NY at 91).  Had we thought the discretionary compensation scheme at issue violated the constitution's fixing requirement, we presumably would have invalidated it rather than holding the compensation in abeyance.  Whatever principle *Noble* established, it did not hold that such a discretionary compensation scheme violated the State Constitution's fixing requirement.

the executive and the legislature both meaningfully participate in the process (*see supra* at 10-13).

The dissent protests that this arrangement leaves the public with "no one to hold responsible other than the government at large" (dissenting op at 26). The public disagrees. New York voters can untangle this scheme and hold their officials responsible (*see, e.g.*, Jesse McKinley, *Why N.Y. Lawmakers Think They Deserve a $50,000 Raise*, NY Times, Dec. 9, 2018). The legislature regularly authorizes administrative agencies to promulgate rules with the force of law; the press and public usually figure out whom to hold responsible even without "a vote of both chambers" (dissenting op at 26).

The dissent also tries unsuccessfully to read something into the fact that the legislature set many of the relevant salaries in the past by writing the numbers directly into the statutory text (*see* dissenting op at 27). "Legislative inaction, because of its inherent ambiguity, affords the most dubious foundation for drawing positive inferences" (*Borquin v Cuomo*, 85 NY2d 781, 787 [1995]). Here, there was not even a rejected proposal, as in *Borquin*, but merely a failure to consider the specific scheme at issue today. Because it is not clear why the legislature did not adopt this approach earlier, this is not strong evidence for the dissent. We have previously upheld compensation practices that were not contemplated by the 1946 legislature: for instance, adjusting future legislative salaries during the lame duck period (*Dunlea*, 66 NY2d at 269), or withholding salaries until after a budget has been passed (*Cohen,* 94 NY2d at 11), or retirement plans for state employees (*Borszeweski v Bridges*, 37 NY2d 361, 367-368 [1975]). We should yet again recognize that a scheme is not unconstitutional merely because it is novel.

## III.

Essentially, the Legislature has removed a great deal of weight from the executive branch in its version of *Tip-It*.  Because the courts add enough weight to steady the balance and keep this precarious structure from toppling, I concur in the result.

SINGAS, J. (dissenting):

Our State Constitution prescribes procedures for the function of our government that all branches are duty bound to follow. Instead of holding the legislature to that principle, the plurality employs an "interpretive gloss" to excuse the legislature's

- 1 -

unconstitutional actions, concluding in essence that they are "close enough to those other cases" to pass constitutional muster. Indeed, one might be forgiven, after reading the plurality opinion, for believing that this case concerned judicial pay raises. It does not. This case involves different legislation, creating a different committee that was given a different mandate. The law at issue represents the legislature's attempt to unburden itself of its unique constitutional power to pass and repeal laws and instead vest that power in a group of unelected individuals, thereby avoiding the important safeguards of the constitutionally mandated lawmaking process. It additionally violates specific constitutional restrictions on how legislative and executive officer pay must be set. Despite the plurality's efforts to create one, there is no exception in the State Constitution for pay raises. I dissent.

## I.

As part of a 2018 budget bill, the legislature created the Committee on Legislative and Executive Compensation (Committee) to "examine, evaluate[,] and make recommendations with respect to adequate levels of compensation, non-salary benefits, and allowances pursuant to [Legislative Law §§ 5 and 5-a], for members of the legislature, statewide elected officials, and those state officers referred to in [Executive Law § 169]" (L 2018, ch 650, § 1, part HHH [Enabling Act], § 1). The Committee was to be made up of the Chief Judge of the Court of Appeals along with

> "the [C]omptroller of the [S]tate of New York, the chairman of
> the State University of New York board of trustees and 52nd
> [C]omptroller for the [S]tate of New York, the [C]omptroller
> for the [C]ity of New York, and the chairman of the [C]ity

[U]niversity of New York board of trustees and 42nd
[C]omptroller for the [C]ity of New York" (*id.*).

The legislature tasked the Committee with determining whether "annual salary and allowances of members of the legislature, statewide elected officials, and salaries of [certain] state officers . . . warrant an increase" (*id.* § 2 [2]). The Committee was directed to consider several nonexhaustive factors:

> "[(1)] the parties' performance and timely fulfillment of their statutory and [c]onstitutional responsibilities; [(2)] the overall economic climate; [(3)] rates of inflation; [(4)] changes in public-sector spending; [(5)] the levels of compensation and non-salary benefits received by executive branch officials and legislators of other states and of the federal government; [(6)] the levels of compensation and non-salary benefits received by comparable professionals in government, academia[,] and private and nonprofit enterprise; [(7)] the ability to attract talent in competition with comparable private sector positions; and [(8)] the state's ability to fund increases in compensation and non-salary benefits" (*id.* § 2 [3]).

The legislation required the Committee to "make a report to the [G]overnor and the legislature of its findings" by December 10, 2018 (*id.* § 4 [1]). The recommendations would "have the force of law" and "supersede" inconsistent provisions of Executive Law § 169 and Legislative Law §§ 5 and 5-a unless modified or abrogated by statute prior to January 1, 2019 (*id.* § 4 [2]).[1] Lastly, the legislation provided that, after acquiring the force

---

[1] Legislative Law § 5 set salaries for members of the legislature at $79,500 per year. Section 5-a provided additional allowances for members of the legislature serving as officers and in other special capacities. For example, pursuant to the statute, the Temporary President of the Senate receives an additional allowance of $41,500, and the Chairman of the Senate Judiciary Committee receives an additional allowance of $18,000. Executive Law § 169 provided the salaries of various state executive officers, such as the

of law, the Committee's recommendations would remain in effect until amended or repealed, either by statute or by act of the previously established Commission on Legislative, Judicial, and Executive Compensation (*id.* § 7).

On December 10, 2018, the Committee—comprising Thomas DiNapoli, Carl McCall, Scott Stringer, and Bill Thompson[2]—issued its report (*see* Report of the Committee on Legislative and Executive Compensation [2018] [Report]). The Committee recommended increasing the base salaries of members of the legislature from $79,500 to $110,000 in 2019, $120,000 in 2020, and $130,000 in 2021 (*id.* at 5-6, 14-16). Effective January 1, 2020, and beyond, the Committee recommended (1) eliminating certain allowances for members of the legislature; (2) placing a 15% cap on outside earned income; and (3) prohibiting the receipt of income in certain professions where a fiduciary duty is owed (*id.*).

Regarding the executive branch, the Committee recommended that the salaries of the Attorney General and State Comptroller be increased from $151,500, to $220,000 in 2020 (*id.* at 6, 17).[3] Finally, the Committee made recommendations consolidating and reorganizing the six tiers of commissioners in Executive Law § 169 to four tiers, and

---

Commissioner of Labor and the Director of the Office for the aging. It divided these positions into six tiers and set a salary for each tier.

[2] Then-Chief Judge Janet DiFiore did not participate in the Committee.

[3] The Report also made recommendations to raise the Governor and Lieutenant Governor's salaries, but recognized that this could only be accomplished by a joint resolution of both houses of the legislature (*see* Report at 16; *see also* NY Const, art IV, §§ 3, 6).

proposed salary increases for 2019, 2020, and 2021 (*id.* at 6, 17-18). For tiers C and D, the Committee set salary ranges, rather than a fixed salary (*id.*). The compensation each individual commissioner would receive within that range would be determined by the Governor (*id.*).

Following receipt of the Committee's recommendations, the legislature took no action. As a result, pursuant to the Enabling Act, all the Committee's recommendations purportedly "acquired the force of law" on January 1, 2019, superseding any "inconsistent" provisions of Legislative Law §§ 5 and 5-a and Executive Law § 169.

In March 2019, plaintiffs brought this declaratory judgment action as citizen taxpayers under State Finance Law § 123-b. Plaintiffs alleged, among other things, that the Enabling Act unconstitutionally delegated legislative authority to the Committee and violated the constitution's requirement that legislative salaries be "fixed by law." Plaintiffs asked the court to declare invalid the Enabling Act and the Committee's recommendations. Defendants moved to dismiss the complaint for failure to state a cause of action.

Supreme Court granted defendants' motion as to pay raises for the Comptroller, Attorney General, and executive commissioners, and the 2019 pay raises for the legislature (2019 NY Slip Op 32723[U] [Sup Ct, Albany County 2019]). The court found that the legislature had given the Committee adequate guidelines to make recommendations for pay raises such that the delegation of authority was constitutional (*id.* at *9-11). However, the court concluded that the Committee exceeded its delegated authority by recommending that certain activities be prohibited and that legislators' outside earned income be limited (*id.* at *12-15). Given that those restrictions on outside income were intertwined with the

2020 and 2021 legislative salary increases, the court invalidated those increases. The court found these issues severable from the other issues, including the 2019 legislative salary increase, and therefore upheld the remainder of the law (*id.* at *17-18). Though defendants initially appealed the portions of Supreme Court's opinion that invalidated the 2020 and 2021 legislative pay raises and limits on outside income and activities, they later withdrew their appeal. Therefore, for legislators, only the portions of the Committee's recommendations eliminating certain allowances and providing a raise to $110,000 remained in effect, and legislators are not subject to any of the Committee's recommended restrictions on outside income.

The Appellate Division modified the judgment insofar as appealed from by plaintiff to declare that the Enabling Act "has not been shown to be unconstitutional" and, as so modified, affirmed (194 AD3d 98, 107 [3d Dept 2021]). Plaintiffs appealed to this Court as of right (*see* CPLR 5601 [b] [1]).

## II.

The plurality fails to acknowledge the non-delegable core legislative function that the Enabling Act vests in the Committee: the power to pass and repeal statutes. The Enabling Act's supersession clause gave the Committee discretion to determine which provisions of certain statutes would stand and which would fall. Because a duly enacted statute may be repealed only by another statute, this was an unconstitutional delegation of legislative power.

A.

"The legislative power of this state shall be vested in the senate and assembly" (NY Const, art III, § 1).  Our Constitution has so provided since 1777, when those bodies were established as the "supreme legislative power within this [s]tate" (1777 NY Const art II).  The legislative power

> "covers every subject which in the distribution of the powers of gover[n]ment between the legislative, executive[,] and judicial departments, belongs by practice or usage, in England or in this country, to the legislative department, except in so far as such power has been withheld or limited by the Constitution itself, and subject also to such restrictions upon its exercise as may be found in the Constitution of the United States" (*Lawton v Steele*, 119 NY 226, 232-233 [1890], *affd* 152 US 133 [1894]).

The Constitution prescribes a carefully crafted procedure that the legislature must follow when enacting a statute.  Absent a statement of necessity from the Governor, a bill must first sit on the desks of legislators for three legislative calendar days (NY Const, art III, § 14).  It must then receive a majority vote of each house (*id.*), and either be signed by the Governor or passed by two thirds of both houses following the Governor's veto (*id.*, art IV, § 7).

This "constitutionally proclaimed, deliberative process" is the bedrock of the legislative function (*Matter of King v Cuomo*, 81 NY2d 247, 254 [1993]), and serves several important purposes.  First, bicameralism adds "wisdom and experience to the governing process," as one house limits the power of the other (Peter J. Galie, Ordered Liberty: A Constitutional History of New York 44 [1996]; *see also INS v Chadha*, 462 US 919, 948-949 [1983] [observing that the bicameralism requirement highlights the belief

among the Constitution's framers that "legislation should not be enacted unless it has been carefully and fully considered" by elected officials]).  The delay requirement of article III, § 14 of our Constitution reflects similar concerns, ensuring that every member "know[s] the precise character of the bill" and giving "the press an opportunity to communicate the bill to the people, who would then have time to express their opinions concerning the measure" before it becomes law (3 Charles Z. Lincoln, The Constitutional History of New York 236, 239 [1906]).

Of equal importance is presentment, which ensures that the legislative power is "subject to executive supervision and control" (4 Lincoln, The Constitutional History of New York at 497).  The Governor is an "essential element of our legislative system" (*id.* at 458), and presentment provides the Governor the opportunity to "consider a bill from several points of view, including its constitutionality, its relation to other legislation, and also its policy or propriety, either general or particular" (*id.* at 499).

Our Constitution does not permit "the delegation of power to make the law, which necessarily involves a discretion as to what it shall be," but it does allow the legislature to "confer[ ] authority or discretion as to its execution, to be exercised under and in pursuance of the law" (*Moses v Guaranteed Mtge. Co. of N.Y*, 239 App Div 703, 707 [1934] [invalidating statute that gave power to suspend provisions of the Banking Law], *revd on other grounds*, 264 NY 476 [1934]).  Indeed, the legislature may delegate its nonlegislative power "with reasonable safeguards and standards, to an agency or commission to administer the law as enacted by the [l]egislature" (*Matter of Levine v Whalen*, 39 NY2d 510, 515 [1976]).  Delegations of this sort can, and often do, authorize administrative

agencies to promulgate rules and regulations that have the force of law. Agency rulemaking is not subject to bicameralism and presentment because it is not an exercise of legislative power, but rather an exercise of "administrative" or "executive" power (*see Mistretta v United States*, 488 US 361, 386 n 14 [1989] ["rulemaking power originates in the (l)egislative (b)ranch and becomes an executive function only when delegated by the (l)egislature to the (e)xecutive (b)ranch"]).

The Committee's recommendations do not follow these established procedures, and yet purportedly acquired the "force of law" and "superseded" existing statutes through the legislature's inaction. The Constitution does not recognize this legislative end-run.

B.

By our constitutional design, the legislature cannot delegate "strictly," "inherently," or "exclusively" legislative powers (*Matter of Trustees of Vil. of Saratoga Springs v Saratoga Gas, Elec. Light & Power Co.*, 191 NY 123, 133-138 [1908]; *see Darweger v Staats*, 267 NY 290, 305 [1935])—"not to the people, not to administrative agencies, and not to committees of the legislature itself" (Peter J. Galie & Christopher Bopst, The New York State Constitution 112 [2d ed 2012]; *see Corning v Greene*, 23 Barb 33, 34 [Sup Ct, Gen Term 1856] ["An attempt . . . to call in another party to aid in the business, and divide the responsibilities, of legislation, so that . . . the sovereign function is discharged, in part at least, by a party unknown and unrecognized by the fundamental law, would be in contravention of the (C)onstitution, and render the act void"]). The power to enact and repeal statutes is a nondelegable core legislative function (*see Matter of Benvenga v LaGuardia*, 294 NY 526, 533 [1945]; *People v Ryan*, 267 NY 133, 137 [1935]; *Matter of*

*Davidson v Walker*, 222 App Div 437, 439 [2d Dept 1928] [the legislature "may not delegate the power to enact a statute, and, conversely, may not delegate the power to repeal it" (emphasis omitted)], *revd on other grounds*, 248 NY 357 [1928]). The legislature can repeal a duly enacted statute only by enacting another statute (*Matter of Moran v LaGuardia*, 270 NY 450, 452 [1936]).

Though it is not clear exactly how to define the Committee's recommendations— and the plurality makes no effort to do so—they are indisputably not statutes. The legislature did not vote on them and they were never presented to the Governor (*see* NY Const, art IV, § 7). Because the recommendations are not statutes, they could only have constitutionally replaced Legislative Law §§ 5 and 5-a and Executive Law § 169 if the legislature independently repealed those provisions (*see Matter of Moran*, 270 NY at 452). It did not.

No provision of the Enabling Act expressly provided for the repeal of those sections nor provided for their complete and automatic repeal upon the Committee issuing its recommendations. Any repeal is therefore both implied and conditional. Our precedent recognizes implied repeal only where there is "an inconsistency between the statutes which is such as to preclude giving effect to both" (*People v Mann*, 31 NY2d 253, 258 [1972]). That is not the case here. Nothing on the face of the Enabling Act indicated which portions of the preexisting statutes the recommendations would supersede, if any. Moreover, rather than provide any concrete condition upon which "supersession" would occur, the legislature left that decision to the Committee's discretion. The Committee could decide whether to supersede all, some, or none of the preexisting statutes. "While the [l]egislature

may delegate powers not legislative which it may rightfully exercise itself, it cannot under the guise of conferring discretion confer authority to make the law" (*Moses*, 239 App Div at 707 [citation omitted]). Conferring this discretion on the Committee gave it the power to repeal statutes and, by implication, the power to enact them. Because the legislature is prohibited from divesting itself of such powers, the Enabling Act's delegation of the supersession power is unconstitutional.

Unable to seriously contend that the legislature itself repealed the preexisting statutes, the plurality avoids the word "repeal" altogether. As the plurality tells it, the legislature did not delegate the power to repeal statutes, but merely the power to supersede them (plurality op at 12-14, 17 n 10). There is no basis to draw a distinction between supersession and repeal (*see* Supersede, Black's Law Dictionary [11th ed 2019] ["To annul, make void, or repeal by taking the place of . . . . (T)he 1996 statute supersedes the 1989 act"]). The power to supersede a statute is the power to repeal it. That power can be exercised only through the lawmaking procedures mandated by the constitution.

## III.

In any event, the plurality maintains that we "addressed the very issue we decide today" in *Matter of Benvenga*, and that this case requires nothing more than a straightforward application of well-settled precedent (plurality op at 16). The plurality cites additional cases, contending that this law is "similar" to prior laws and commissions (*see* plurality op at 5 [2010 statute "closely resembles" the Enabling Act], 7 [describing a "similar commission" created in 2015], 8 [characterizing the Committee as a "similar body"]), even though this Court never passed on those prior delegations (*see* plurality op

at 4-9). Contrary to my concurring colleagues' claims, we have never approved a delegation of the power to "supersede" duly enacted statutes.[4]

The plurality asserts, in a footnote, that this dissent violates stare decisis by refusing to acknowledge that this case is controlled by *Matter of Benvenga* (plurality op at 17 n 10). There, the legislature established judicial salaries by statute and authorized a New York City administrative board to provide additional compensation to local judges (*see Matter of Benvenga*, 294 NY at 530-532, citing L 1928, chs 818, 819). The legislature intended the additional locality pay to supplement judges' compensation based on local needs, not to change or replace the statutory salary (*see id.*; L 1928, chs 818, 819). The statutes at issue there contained no supersession clause at all—and one was not necessary because the legislature did not purport to give the City the power to alter or repeal existing statutes regarding judicial pay.

The plurality finds "no basis for distinguishing" this case from *Benvenga* (plurality op at 17). But the Enabling Act delegated more than just the authority to "determine whether . . . salaries should be increased beyond the amount set by statute" (*id.*). It granted

---

[4] *Matter of General Elec. Capital Corp. v New York State Div. of Tax Appeals, Tax Appeals Trib.* (2 NY3d 249 [2004]) and *Matter of Medical Socy. of State of N.Y. v Serio* (100 NY2d 854 [2003]) do not concern supersession and are irrelevant to this discussion (*see* concurring op at 22-23). Moreover, the concurrence distorts the quote from *Matter of Town of Aurora v Tarquini* (*compare* 77 NY2d 354, 358 [1991] ["the legislation was designed to reconcile and consolidate existing fire prevention and structural regulations into a single, uniform code in order to provide a minimum level of protection for citizens throughout the (s)tate"], *with* concurring op at 23 ["Supersession is routinely applied in our fire safety regulations, facilitating a statutory scheme that "reconcile(s) and consolidate(s) existing fire prevention and structural regulations into a single, uniform code . . . throughout the State' "]). That case, involving administrative regulation of pool enclosures, has no bearing on the legislature's ability to delegate the supersession power.

the Committee the distinct power to "supersede" inconsistent portions of preexisting

statutes, and in some cases provided *decreased* compensation. For example, in 2018, a

senator holding the office of Vice President pro tempore would have earned an annual base

salary of $79,500 and an additional allowance of $34,000, for a total annual salary of

$113,500 (*see* Legislative Law §§ 5, 5-a). The Committee eliminated that allowance; a

senator holding the same office now earns $110,000 annually—less than what the

Legislative Law mandates. And in recommending changes to Executive Law § 169, the

Committee "superseded" far more than just a salary figure. It gave an entirely different

branch of government the authority to set certain officers' salaries within a range. It also

reorganized the statutory tier structure from six tiers to four and reclassified officers among

the tiers. True, one can still find Executive Law § 169 in the Consolidated Laws, but it is

hard to see how that statute "remain[s] on the books" in any meaningful way (plurality op

at 17 n 10). *Matter of Benvenga* simply does not concern the issue we decide here.

Nor does *Matter of Maron v Silver* (14 NY3d 230 [2010]) have any bearing on the

issues before us. In that case, we held "that the State had unconstitutionally compromised

the independence of the judiciary over the course of three years by linking any decision on

whether to increase judges' salaries with other legislative initiatives such as the enactment

of legislative pay increases and campaign finance reform" (*Larabee v Governor of the State

of N.Y.*, 27 NY3d 469, 473 [2016], citing *Matter of Maron*, 14 NY3d at 245-246, 260-261).

*Matter of Maron* had nothing to do with supersession. The portions of that opinion that

the plurality cites are nothing more than a factual reference to two failed bills that contained

supersession clauses (*see* plurality op at 5).  Our decision did not so much as mention those

clauses, much less uphold their constitutionality (*see Matter of Maron*, 14 NY3d at 245).

After *Matter of Maron*, the legislature created a Commission on Judicial

Compensation similar to the Committee at issue here (*see* L 2015, ch 60, part E).  That

commission recommended judicial salary increases, which took effect without required

action from the legislature.  In *Larabee*, we considered whether prospective salary raises

effected by the commission adequately remedied the past constitutional violation that led

to our decision in *Matter of Maron* (27 NY3d at 472).  The plaintiffs sought money

damages as compensation for those past violations, which we denied (*id.* at 472, 475-476).

The plurality once again cites only the facts set forth in that opinion and agrees that this

Court never approved of the supersession clause (plurality op at 6 n 3).

In 2015, the legislature created another commission vested with the power to

supersede statutes, and again we did not pass on its constitutionality.  The plaintiffs in that

case did not meaningfully challenge the validity of the supersession power, arguing instead

that the statute lacked adequate standards and safeguards (*see Center for Jud.*

*Accountability, Inc. v Cuomo*, 167 AD3d 1406, 1410-1411 [3d Dept 2018]; *see infra* at 15-

16 [explaining why this analysis does not apply to the present case]).  We dismissed the

appeal on the ground that no substantial constitutional question was directly involved (*see*

33 NY3d 993 [2019], never addressing the distinct constitutional question of supersession, which is squarely presented here (*see* CPLR 5601 [b] [1]).[5]

IV.

If, as the plurality contends, the Enabling Act truly limited the Committee's authority to providing additional compensation above existing levels, then the supersession clause itself would be superfluous, and the plurality need not defend it at all. But as discussed above, the Committee's authority was not so limited, and the plurality therefore must attempt to defend this delegation. The plurality reasons that the legislature can delegate the supersession power to a temporary commission, so long as the delegation is for a "discrete purpose" (plurality op at 12) and is "tightly cabined" by adequate standards and safeguards (plurality op at 19). That position finds no support in our law.

First, the Committee is not a temporary commission of a sort that this Court has previously accepted (*see* NY Const, art V, § 3). In search of relevant precedent, the plurality cites to cases involving the Bartlett Commission (plurality op at 12-13). That case law is entirely inapposite. The Bartlett Commission "merely proposed legislation to the [l]egislature, it did not enact the new law" (*People ex rel. Dudley v West*, 87 Misc 2d 967, 969 [Sup Ct, Kings County 1976]). The legislature subsequently adopted many of the

---

[5] Insofar as the statute at issue in *McKinney v Commissioner of N.Y. State Dept. of Health* (41 AD3d 252 [1st Dept 2007]; *see* plurality op at 18) authorized a commission to supersede statutes—and it did not do so explicitly—we did not have occasion to address the issue (9 NY3d 891 [2007]). Additionally, the recommendations in that case could not become law without the Governor's approval and were subject to rejection by concurrent resolution of the legislature. Whatever constitutional issues those mechanisms may have raised, they differ substantially from the process at issue here.

commission's recommendations by statute passed by both houses and signed by the Governor. Although the Committee and the Bartlett Commission differ in this most critical regard, the plurality analogizes the two, reasoning that the Enabling Act was valid even though it provided "that the Committee's recommendations, unlike those of the Bartlett Commission, were to go into effect by operation of law, and without further action by the [l]egislature" (plurality op at 12). The plurality holds, in other words, that the Enabling Act was valid even though the Committee's recommendations, unlike those of the Bartlett Commission, became law without following constitutionally mandated lawmaking procedure.

The plurality then attempts to distinguish the Committee from the commission invalidated in *Hurley v Public Campaign Fin. & Election Commn.* (69 Misc 3d 254 [Sup Ct, Niagara County 2020]). That commission, like the Committee here, had the power to make recommendations that would supersede inconsistent provisions of the Election Law and State Finance Law (*see id*. at 258). Supreme Court invalidated that commission's enabling statute precisely because it "empowered the [c]ommission to legislate new law and repeal existing statutes" without following the "proper procedure" (*id.* at 260-261). The plurality ignores the clear similarities between the commission in *Hurley* and the Committee in this case. Instead, it attempts to distinguish them on the grounds that the Enabling Act, unlike the enabling statute in *Hurley*, contains reasonable safeguards and standards that narrow the scope of the delegation (plurality op at 18, 20).

At this point, the plurality invokes the test we announced in *Matter of Levine*. That test asks whether the legislature has provided adequate safeguards and standards such that

an agency has the power merely to administer and execute the law, not the uniquely

legislative "power to make the law, which necessarily involves a discretion as to what it

shall be" (*Matter of Levine*, 39 NY2d at 515).  It is irrelevant whether the legislature

provided adequate standards here, because the Committee was not charged with executing

or administering the law, and the plurality does not contend otherwise.  The Committee

was charged with the exclusively legislative power to repeal statutes.  The plurality offers

no rationale for borrowing our precedent concerning delegations of administrative and

executive power (*see id.*) and using it, without foundation, to justify supersession here

(plurality op at 12-15 and nn 6, 7).  Whatever powers and functions the legislature may

constitutionally assign to a temporary commission under article V, § 3 cannot include

legislative powers and functions.  Assigning these functions circumvents the constitutional

process and eliminates the Governor's role.  No "standards" can excuse that violation.[6]

---

[6] As a practical matter, the "standards" and "safeguards" in the Enabling Act had no bearing on the Committee's power to repeal duly enacted statutes.  The Enabling Act merely set out the "factors"—such as "the overall economic climate" and "the ability to attract talent"—that the Committee could consider in making its determinations.  It is hard to see how these "standards" served to "cabin" the Committee's discretion in deciding which portions of the statutes to repeal (plurality op at 14 and n 8).  And the Committee was robust in the exercise of its broad authority.

Moreover, contrary to the plurality's interpretation, the phrase "where appropriate" in the Enabling Act's supersession clause in no way limited the Committee's discretion (*see* plurality op at 20).  That phrase was clearly included to account for the fact that the preexisting law would remain unchanged if the Committee made no recommendation as to a subject, not to enforce the standard that the plurality supplies today.  Nor did the provision permitting the legislature to modify or abrogate the recommendations by statute act as a meaningful safeguard against inappropriate recommendations (plurality op at 13).  That provision merely restated the legislature's inherent power to repeal statutes.

The Constitution, not the legislature, provides the standards and safeguards required for exercises of legislative power: bicameralism and presentment.

Based on "similar" cases never passed upon by this Court, case law involving delegations of rulemaking authority to the executive branch, and promises of heightened judicial scrutiny, the plurality holds that the legislature may assign exclusively legislative power to a temporary commission where the commission has a "discrete purpose" and the legislature "set[s] standards on the exercise of authority through appropriate guidance" (plurality op at 12). This holding "undermines the integrity of the law-making process" (*Matter of King*, 81 NY2d at 255). Requiring that the legislature adhere to the constitutionally defined lawmaking process "is not some hypertechnical insistence of form over substance, but rather ensures that the central law-making function remains reliable, consistent[,] and exposed to civic scrutiny and involvement" (*id.*). Today's decision fails to do so.[7] As a result, it is possible to foresee all manner of future committees, insulated from the political process, to which the legislature may offshore certain lawmaking responsibility.

---

[7] Even accepting the plurality's overly generous interpretation of our nondelegation rules, the supersession clause makes no mention of Executive Law § 40 (Comptroller compensation) or 60 (Attorney General compensation) (*see* Enabling Act § 4 [2]). Accordingly, under the plurality's own analysis, the Committee's recommendations to raise the Attorney General's and Comptroller's salaries from $151,000 to $220,000 had no legal effect because they were not within the purportedly "narrowly defined" power to "supersede" preexisting law addressing the same subject matter (*see* plurality op at 18, 19).

Today the plurality gives the legislature a pass. Perhaps this Court will eventually draw a line to prevent further erosion of the legislature's exclusive authority to exercise lawmaking power.

V.

The scope of the legislature's power to set legislative and certain official's salaries is also expressly limited by specific constitutional provisions regarding that very subject. The text and history of these constitutional restrictions require that a statute provide an unchanging level of compensation for legislators and constitutional state officers. The legislature also failed to comply with this mandate.

A.

Since a legislative pay provision first appeared in the Constitution in 1821, the issue of the amount of power to give the legislature in determining their own salaries has been the subject of considerable debate. In 1821, the convention opted to provide for a salary "ascertained by law" with a constitutional cap of three dollars a day (*see* 1821 NY Const, art I, § 9). There was some debate about whether to impose a cap at all because "[p]ublic opinion would . . . always regulate the sum, and it would be such as would be reasonable" (Nathaniel H. Carter & William L. Stone, Reports of the Proceedings and Debates of the Convention of 1821, at 420 [1821]). Others argued that there was no reason to think that the legislature would not "pursue[ ] the very course which public opinion has condemned" (*id.*). The convention ultimately agreed that allowing the legislature to fix salaries under a certain cap would provide needed flexibility while protecting against overcompensation (*see* 1821 NY Const, art I, § 9).

Skepticism for the legislature's role eventually won out in 1846 when legislative salaries were fixed at three dollars a day (1846 NY Const, art III, § 6). In 1874 this was changed to $1,500 per year by amendment proposed by the Constitutional Commission (*id.*, as amended 1874) and in 1927 to $2,500 by general amendment (1894 NY Const, art III, § 6, as amended 1927).

In 1946, the Joint Legislative Committee on Legislative Methods, Practices, Procedures, and Expenditures proposed an amendment to remove a dollar amount from the Constitution altogether, "[r]ather than repeat the error of inflexibility by fixing the compensation of legislators and legislative leaders in the Constitution, and thus fail to provide for changing conditions and circumstances" (Final Report of the New York State Joint Legislative Committee on Legislative Methods, Practices, Procedures and Expenditures, 1946 NY Legis Doc No. 31 at 170). This report urged the adoption of an amendment "to permit the fixing of legislative salaries by law as is done in Congress," (*id.*) thereby "vesting the [l]egislature with the power to adjust salaries by law" (*id.* at 171). It noted that exercising this power "of course, would require the consent of the Governor" (*id.*). The joint commission was assured that the legislature would not abuse this power:

> "Experience proves that empowered to determine the rate of its own compensation, the [l]egislature would be extremely conservative, if one may judge by the experience of Congress and state legislative bodies with the authority to change salary by law. In revising legislative salaries the [l]egislature and the Governor would necessarily always be guided by public opinion" (*id.*).

This proposed amendment, still in our Constitution today, was adopted by the people in 1948 and provides that "[e]ach member of the legislature shall receive for his or her

services a like annual salary, to be fixed by law" along with a per diem and other

allowances, both also "to be fixed by law" (NY Const, art III, § 6). For 70 years, from

1948 until the passage of the Enabling Act in 2018, the legislature enacted statutes fixing

legislators' salaries in the Legislative Law. In 1948 it was set at $5,000 (L 1948, ch 20),

and was amended seven times by statute passed by a majority of both houses and signed

by the Governor between then and 1998,[8] when it was fixed at $79,500 (L 1998, ch 630).

In its current form, Legislative Law § 5 still lists $79,500 as legislators' annual salary.

Regarding executive officers named therein, the 1846 Constitution provided that

they should "receive . . . a compensation, which shall not be increased or diminished"

during their term in office (1846 NY Const, art V, § 1). The proposer of this provision

reasoned that leaving the issue to the legislature would "preserv[e] the accountability of

these public servants, and the amount of compensation they shall receive, to the

representative body" (S. Croswell & R. Sutton, Debates and Proceedings in the New-York

State Convention for the Revision of the Constitution 404 [1846]). Thus, it was left to the

"[l]egislature to fix the salaries" (*Problems Relating to Executive Administration and*

*Powers*, 1938 Rep of NY Constitutional Convention Comm, vol 8 at 121). The language

clarifying that this compensation must be "fixed by law" was added in 1874, upon an

amendment approved by the people (*see* 1846 NY Const, art X, § 9, as amended 1874)

keeping it "subject to statutory regulation" (4 Lincoln, The Constitutional History of New

---

[8] L 1954, ch 314 ($7,500); L 1961, ch 946 ($10,000); L 1966, ch 809 ($15,000); L 1973, ch 386 ($23,500); L 1981, ch 55 ($28,788 in 1981, $30,804 in 1982, $32,960 in 1983); L 1984, ch 986 ($43,000); L 1987, ch 263 ($43,000).

York at 765). Pursuant to this provision, until this case, the Comptroller's and Attorney General's salaries were fixed in Executive Law §§ 40 and 60, and periodically amended by statute approved by both houses of the legislature and signed by the Governor. The relevant constitutional language today remains unchanged, and provides that "[e]ach of the state officers named in th[e] [C]onstitution shall, during his or her continuance in office, receive a compensation, to be fixed by law, which shall not be increased or diminished during the term for which he or she shall have been elected or appointed" (NY Const, art XIII, § 7). In their current forms, Executive Law §§ 40 and 60 set the Comptroller's and the Attorney General's salaries at $151,500. The Constitution imposes no specific requirements as to the compensation of executive officers not named therein.

B.

"In the construction of constitutional provisions, the language used, if plain and precise, should be given its full effect" and "[i]t must be presumed that its framers understood the force of the language used and, as well, the people who adopted it" (*People v Rathbone*, 145 NY 434, 438 [1895]). The Constitution is "an instrument framed deliberately and with care, and adopted by the people as the organic law of the [s]tate" (*Matter of King*, 81 NY2d at 253 [internal quotation marks omitted]). "[I]nterstitial and interpret[ive] gloss by the courts or by the other [b]ranches themselves that substantially alters the specified law-making regimen" is prohibited (*id.*).

Courts therefore "do not have the leeway to construe their way around a self-evident constitutional provision by validating an inconsistent practice and usage of those charged with implementing the laws" (*id.* [internal quotation marks omitted]). Instead, "[t]he words

of the Constitution, like those of any other law, must receive a reasonable interpretation, considering the purpose and the object in view" (*Association for Protection of Adirondacks v MacDonald*, 253 NY 234, 238 [1930]).  This involves analyzing "the provision in which the questioned phrase appears," the "circumstances and practices which existed at the time of the passage of the constitutional provision," and "the conduct of the [l]egislature as it exercised its authority under" the amended provision (*New York Pub. Interest Research Group v Steingut*, 40 NY2d 250, 258 [1976]).

The Constitution provides that each member of the legislature "shall receive for his or her services a like annual salary, to be fixed by law," "an additional per diem allowance, to be fixed by law," and "any allowance which may be fixed by law for the particular and additional services appertaining to or entailed by such office or special capacity" (NY Const, art III, § 6).  "Neither the salary of any member nor any other allowance so fixed may be increased or diminished during, and with respect to, the term for which he or she shall have been elected" (*id.*).  It states that the "provisions of this section and laws enacted in compliance therewith shall govern and be exclusively controlling, according to their terms" (*id.*).  It similarly provides that state officers in the executive branch "shall . . . receive a compensation, to be fixed by law, which shall not be increased or diminished during the term for which he or she shall have been elected or appointed" (*id.*, art XIII, § 7).

Dictionaries from the time of the amendment regarding legislative salaries define "fix" as "[t]o set or place definitely; establish; settle"; "[t]o render permanent; to give an unvarying form to" (Webster's Collegiate Dictionary 378 [1945]).  The term "fixed"

clearly calls for an unchanging level of compensation. As such, the salaries were not "fixed" by the Enabling Act, and neither defendants nor the plurality contend otherwise (*see* plurality op at 3 n 2). Instead, defendants argue that the Committee's recommendation made the salaries "fixed by law." The Constitution provides that "no law shall be enacted except by bill" (NY Const, art III, § 13) and states that no bill shall be "passed or become a law, except by the assent of a majority of the members elected to each branch of the legislature" with the "ayes and nays entered on the journal" (*id.* § 14). "Every bill which shall have passed the senate and assembly shall, before it becomes law, be presented to the [G]overnor; if the [G]overnor approve, he or she shall sign it" (*id.*, art IV, § 7).

Contemporary cases interpreting similar provisions in the Constitution reached consistent conclusions. The year before the amendment to article XIII, § 7's predecessor was proposed, the General Term was faced with the interpretation of the phrase "established by law" in the context of setting county judges' salaries (*see Healey v Dudley*, 5 Lans 115 [Sup Ct, Gen Term, 4th Dept 1871]). That court opined that "[w]hen an act is to be done according to law, or a thing is to be established by law, we all understand that the law intended is a law passed by the legislature, and not by some inferior body acting under powers conferred by the legislature, unless, from the nature of the case, the act of the inferior body is obviously intended" (*id.* at 119).[9] The court concluded that the

_____

[9] The concurrence again divorces the language of a case from its context to buttress its arguments (concurring op at 26-27). The phrase "unless the act of the inferior body is obviously intended" acknowledges basic principles of construction. Here, there is nothing in our constitutional history or text demonstrating that the Committee's acts were "obviously intended." Moreover, a statute that is "obviously intended" to allow a delegation cannot overcome a constitutional prohibition against delegation.

constitutional provision at issue evinced no intent to allow the "inferior body" (there, the board of supervisors) to set county judges' salaries.  This Court cited *Healey* in 1917, stating that a salary of a surrogate, required to be "established by law" (1894 NY Const, art VI, § 15), "must be fixed by the legislature" (*People ex rel. Noble v Mitchel*, 220 NY 86, 90 [1917]; *see also Brinckerhoff v Bostwick*, 99 NY 185, 190-191 [1885] ["Such expressions as 'required by law,' 'regulated by law,' 'allowed by law,' 'made by law,' 'limited by law,' 'as prescribed by law,' 'a law of the [s]tate,' are of frequent occurrence in the Codes and other legislative enactments; and they are always used as referring to statutory provisions only"]).

Between the adoption of the phrase "fixed by law" in the two constitutional provisions at issue, this Court considered language in the Constitution stating that "[w]hen the duration of any office is not provided by this Constitution, it may be *declared by law*" (1894 NY Const, art X, § 3 [emphasis added]).  The New York City Civil Service Commission promulgated regulations providing certain hurdles to removing an employee that the Court concluded, as to the employee, violated statutory rules about removal for cause, and further concluded that "in the case of public officers such duration of term and permanence of tenure must proceed from the action of the legislature itself, for so the Constitution ordains" (*People ex rel. Percival v Cram*, 164 NY 166, 170-171 [1900]).  The Court explained that "[t]he power cannot be delegated to the civil service commission (if we assume that such was the statutory intent) nor the term of an office be prescribed by its regulation" (*id.* at 171; *see also Benton County Council of Benton County v State ex rel. Sparks*, 224 Ind 114, 125, 65 NE2d 116, 120 [1946] ["the term 'fixed by law' in its general

and ordinary sense does not include a salary fixed by an administrative board"]; *Colbert v Bond*, 110 Tenn 370, 381-382, 75 SW 1061, 1063 [1903] ["The law ascertaining this compensation must be enacted by the (l)egislature, the only lawmaking power.  This lawmaking power cannot be delegated to any other body"]; *Dane v Smith*, 54 Ala 47 [1875] [" 'Established by law' . . . means *declared by legislative enactment*.  This can be done only by the lawmaking power"]).

This interpretation is also in line with the purpose of both provisions.  The constitutional conventions and commissions have, over time, expressed uncertainty about giving the legislature the power to set their own and state officers' salaries.  But in both cases, ultimately, the fact that the legislature would be directly accountable to the people provided adequate assurances that this power would not be abused.  This history belies the plurality's one-dimensional view that the only aim of the 1948 amendment to article III, § 6 was to make the process more flexible.  Instead, it was to make the process more flexible, while maintaining accountability.  Handing this power to a committee of unelected individuals who are not directly accountable to public opinion frustrates this purpose by removing the onus of the decision-making from the body over which the public exerts influence through elections.  Without a vote of both chambers on whether raises should be implemented, the public has no one to hold responsible other than the government at large.  For better or for worse, the substantial political difficulties that have impeded statutory raises were an anticipated consequence, rather than a flaw, of vesting that power with the legislature.

In the 70 years after the amendment to article III, § 6, and the over 140 years after the amendment to article XIII, § 7, the legislature has enacted legislators', the Comptroller's, and the Attorney General's salaries by statute passed by a majority of both houses and signed by the Governor.  To the extent that the legislature's contemporaneous understanding of their own powers factors into the analysis, their decades of uniformly changing salaries by statute supports the text's history and purpose.

Federal cases cited by the plurality interpreting the U.S. Constitution's requirement that legislative salaries be "ascertained by law" carry little weight (*see* US Const, art I, § 6).  While Congress only has the powers given to it by the United States Constitution, the state legislature's power is plenary, "limited only by the national and state constitutions. For this reason, a list of enumerated powers comparable to [the U.S. Constitution] does not appear in [Article III].  On the contrary, later sections of this article contain specific restrictions on the exercise of legislative power" (Galie & Bopst, The New York State Constitution at 112).  Thus, while federal constitutional provisions regarding legislative powers must be read in the context of granting certain powers, those in the State Constitution must be read in the context of restricting them.  The plurality nonetheless cites legislative history indicating that the 1947 amendment was passed to align the process for setting legislative salaries in New York to the process used by the federal government. From this, the plurality concludes that if Congress can do it, so can we (*see* plurality op at 23-24).  Critically, though, the plurality fails to mention that in 1948 when the amendment was enacted, *no attempt had ever been made to set congressional salaries other than by*

*statute*. The plurality's implication that the meaning of our own Constitution may be changed by Congress's subsequent actions is analytically suspect.

Moreover, even accepting the similarity of the two provisions, the federal cases the plurality cites interpreting the U.S Constitution's Ascertainment Clause carry little persuasive authority (*see Humphrey v Baker*, 848 F2d 211 [DC Cir 1988]; *Pressler v Simon*, 428 F Supp 302 [D DC 1976 three-judge panel]). First, *Pressler* interprets the word "ascertain," and appears to start with the premise that the "ascertainment" must be accomplished by statute (428 F Supp at 305 [concluding that statute delegating power did so "by law" and "it only remains to consider whether or not the verb 'ascertain' has such a narrow and limiting effect that, as a matter of constitutional law, it was intended to prevent the Congress from developing rational procedures of this type"]). Of course, there is no dispute here as to the meaning of the term "fixed" and the plurality does not propose that the Enabling Act somehow "fixed" compensation. Instead, the plurality's argument appears to be that the Committee's recommendations are somehow "law" despite never receiving a majority vote in either the Senate or Assembly nor being signed by the Governor (plurality op at 3 n 2 ["the critical phrase . . . for purposes of this appeal is 'by law' "]). In any event, *Pressler*'s conclusion that "ascertainment" included directing another body to follow rational procedures for fixing congressional compensation was based on federal constitutional history, which did not reflect the skepticism for the legislature's role that has motivated the treatment of this issue in the State Constitution. Our distinct constitutional history elucidates the interpretation of our own Constitution.

Though the District Court's decision in *Pressler* was affirmed without opinion by the U.S. Supreme Court, the basis for that affirmance is unclear, and may have rested on plaintiff's lack of standing (*see* 434 US 1028 [1978, Rehnquist, J., concurring] ["Our 'unexplicated affirmance' without opinion could rest as readily on our conclusion that appellant lacked standing to litigate the merits of the question as it could on agreement with the District Court's resolution of the merits"]).  Nonetheless, in *Humphrey*, the D.C. Circuit held that the Supreme Court's affirmance of *Pressler* was binding on its analysis and merely adopted the District Court's reasoning from that case, providing no additional analysis (848 F2d at 215-216).[10]

The state cases on which the plurality relies fare no better (*see* plurality op at 23-25).  *People ex rel. Morris v Edmonds* dealt with whether judges could be paid additional compensation *beyond* that prescribed by the legislature (15 Barb 529, 532-536 [Sup Ct 1853]).  When we cited that case in *Matter of Benvenga*, we made clear that "Justices of the Supreme Court are [s]tate officers whose compensation must be prescribed by the [l]egislature, subject to the constitutional provision" requiring them to be "established by law" (294 NY at 530).  We narrowly described the rule from *Edmonds*, that "the [l]egislature may confer limited authority to pay additional compensation to such justices" (*id.*).  Of course, the legislature here attempted to confer authority to determine the legislators' entire salaries, repealing those already "fixed by law" (*see supra* at 12-13).  Far

---

[10] The plurality's replacement of the word "ascertained" with the word "fixed" in that case's holding (plurality op at 23) does not change the immateriality of its analysis to the issue at hand.

from "endors[ing]" the language the plurality quotes from *Edmonds* (plurality op at 24), the Court in *Matter of Benvenga* only provided a general citation and did not adopt any language from that case. The plurality simply does not cite a single case supporting its conclusion that, in this context, the phrase "fixed by law" does not mean "fixed by statute."

The text and history of the two provisions at issue confirm that to satisfy article III, § 6, and article XIII, § 7, the legislature must enact a statute providing for an unchanging level of compensation. Thus, even if the delegation in the Enabling Act were otherwise permissible, it would nonetheless be unconstitutional insofar as it allowed the salaries of legislators, the Attorney General, and the Comptroller to be fixed other than by a duly enacted statute.

## VI.

Our Constitution's mandates are clear. Only the legislature may pass and repeal laws, and the legislature itself must fix the salaries of legislators and officers named in the Constitution. The plurality's tortured journey to a contrary result leads us far astray from these settled principles. The legislature must follow the lawmaking process of bicameralism and presentment to pass and repeal laws. Because the Enabling Act's supersession clause instead gives the Committee the power to perform this crucial step, I would declare that provision of the Enabling Act unconstitutional.

Order affirmed, with costs. Opinion by Acting Chief Judge Cannataro. Judges Rivera and Troutman concur. Judge Wilson concurs in result in an opinion. Judge Singas dissents in an opinion, in which Judge Garcia concurs.

Decided November 17, 2022